UNITED STEELWORKERS OF
AMERICA, AFL–CIO–CLC,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

The Dow Chemical Company,
Intervenor.

No. 74–2163.

United States Court of Appeals,
Third Circuit.

Argued Sept. 11, 1975.

Decided Jan. 8, 1976.

Michael H. Gottesman, Robert M. Weinberg, Bredhoff, Cushman, Gottesman & Cohen, Washington, D. C., Warren H. Pyle, Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass., for petitioner; Bernard Kleiman, Chicago, Ill., of counsel.

Elliott Moore, Deputy Associate Gen. Counsel, Peter M. Bernstein, Atty., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Kenneth C. McGuiness, Robert E. Williams, Washington, D. C., Thomas W. Misner, Midland, Mich., for intervenor.

Before ALDISERT, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

The major question in this petition for review and cross-application for enforcement of a National Labor Relations Board order is whether the Board should have considered the effect of *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The Board found that the company had committed an unfair labor practice, and that the union struck in protest, but that the strike breached a no-strike clause in a labor contract providing for grievance and arbitration procedures. Although we will not disturb the Board's conclusion that the company committed an initial unfair labor practice, we will grant the petition for review of other portions of the Board's order and remand the proceedings to the Board for reconsideration.

### I.

The case derives from a dispute between the Dow Chemical Company and a local of the Allied and Technical Workers Union[1] representing latex department employees at the Dow plant in Allyn's Point, Connecticut. Prior to May of 1971, 16 of the 19 latex department employees worked on a "7 and 2" shift—seven days on the job, then two days off; three others worked a regular five-day week. After the company lost a large customer, with a resulting sales drop, it decided to institute a five-day work week for all latex department employees. The company estimated that, as a consequence of the change, the 16 affected employees would earn approximately $570 less annually[2] due to the reduction

---

1. The International Union of District 50, Allied and Technical Workers, Local 13744 filed the original complaint with the General Counsel to the NLRB. That local has since become a part of the United Steelworkers of America.

2. The union estimated each affected employee would lose about $1,500–$2,000 annually.

in hours worked, the elimination of over-time, and the loss of weekend and holiday premiums. The union protested the company's proposed action, contending that the company could not implement the change without first bargaining. The company answered that, under the labor contract's management-rights clause, it could make the change without bargaining.[3]

The collective bargaining agreement in effect at the time contained a no-strike, no-lockout provision which preserved to the union a limited right to strike. The union could not strike, however, unless and until three pre-conditions had been satisfied: first, a five-step grievance procedure had to be exhausted; second, a written request to proceed to arbitration had to be filed within 30 days of the completion of the five steps; third, the arbitration process had to be completed or refused by the company.[4] Step 5 of the grievance procedure provided:

> Step 5. Should a satisfactory solution not be arrived at in Step 4, the Union chairman of the grievance committee shall so notify the Plant Manager, or appointee, in writing and within ten days the Company shall arrange for the unresolved case to be reviewed by the Midland Division Manager in charge of the Allyn's Point Plant or his appointees.

3. Company Personnel Manager James Johnson stated that the company "would be willing to discuss it, but as far as negotiating, no."

4. 7.7 *Strikes and Lock-Outs.*

> The Union will not cause or engage in or authorize its members to engage in any strike against the Company, nor will any members of the Union take part in any other strike or stoppage or curtailment of work or restriction of production or interference with production of the Company, unless and until all of the Bargaining and Grievance Procedures outlined in this agreement have been exhausted. The Company will not cause or sanction any lock-outs unless and until all of the Bargaining and Grievance Procedures as outlined in this Agreement have been exhausted.
>
> The Bargaining and Grievance Procedure in this Article has not been exhausted until all items, a, b, and c, have been carried out as set forth below:
>
> (a) The Grievance Procedure has been used and completed as set forth in Section 7.1.
>
> (b) The Grievance Procedure has been processed through the last Step in Section 7.1 and the Union or the Company has requested in writing, within 30 days, to proceed to arbitration as per Section 7.2.
>
> (c) The Arbitration Procedure in Section 7.2 has been completed or the Union has been denied the right to the use of arbitration.

App. at 298a. The arbitration provision was broad in scope, and an arbitrator's decision was final and binding. However, submission to arbitration was predicated upon consent. The contract provided:

> 7.2 *Arbitration.*
>
> Should the Grievance Procedure outlined in 7.1 of this article fail to resolve a problem involving a layoff, a discharge, or the interpretation of any provision of this agreement, such problem may be submitted to any arbitrator or a board of arbitration provided the bargaining committees representing the Union and the Company each furnish written consent to utilize arbitration.
>
> The agreement to arbitrate shall contain a statement of the issue or issues to be submitted to arbitration. This statement of issue or issues shall be arrived at by joint action of the Union and Company representatives. The agreement to arbitrate shall also provide that the arbitration decision will be final and binding on both parties. The arbitrator, or the method of selecting an arbitrator or a board of arbitration will be agreed upon by the two bargaining committees. (All expenses incident to the service of the arbitrator shall be paid jointly by the Union and the Company.) (The Company shall not be obligated to pay for time lost in carrying out arbitration.)
>
> Separate grievances may not be joined in one arbitration proceeding except by mutual agreement of the parties.
>
> The parties hereto may appoint an impartial arbitrator by mutual agreement; failing to agree on such appointment, an arbitrator shall be chosen from a list of seven names submitted by the Federal Mediation and Conciliation Service.
>
> The arbitrator will be selected from this list by means of the strike-off method, with the Union having the privilege of striking off the first name. The last name remaining will constitute the agreed-upon arbitrator.
>
> The arbitrator shall make no award affecting a change, modification, subtraction, or addition to this Agreement, and shall confine himself strictly to the facts submitted in the hearing, or post hearing briefs, the evidence before him and the terms of the Agreement.

*Ibid.* at 297a.

App. at 296a–97a.

The parties agree that they completed the first four steps of the grievance procedure, with the Step 4 meeting taking place on June 3, 1971. On June 4, the Friday before the schedule change was to be implemented, a union representative, the company's industrial relations manager for the plant, and the company's industrial relations manager for the division encompassing the plant conducted a three-way telephone conversation. Nothing was said about a Step 5 meeting. The following Monday, June 7, a company representative and a union representative addressed about 100 production employees in the plant parking lot. After the meeting, the union representative testified, "the whole thing erupted", with the employees shouting that they were not going to work.[5] Picketing began the next day. Subsequent meetings with state mediation officials failed. During the summer, the company wrote three letters beseeching the employees to discontinue the "unlawful strike". On July 23, the company wrote telling the employees that it would begin hiring replacements July 29. By letter of August 9, the company rescinded the collective bargaining agreement. Eight days later the company terminated the striking employees. Shortly thereafter a majority of the then-employees petitioned the company stating that they no longer wished to be represented by Local 13744. Consequently, by letter dated August 28, the company informed the union that it would no longer recognize the union as bargaining agent for the hourly rated employees at the plant.

## II.

When the dispute reached the National Labor Relations Board, the company argued alternatively (1) that it had the right to implement the schedule change under the management-rights clause, and (2) that, if it did not, the union's strike was unprotected activity in derogation of the collective bargaining agreement. Accordingly, the company contended it had the right to rescind the collective bargaining agreement, terminate the employees and refuse to recognize the union as the bargaining agent.

The union, on the other hand, argued that it had complied sufficiently with the grievance procedure so that the strike was not violative of the no-strike clause. Even if the strike did violate the contract, however, the union argued that the strike was in protest of an unfair labor practice and therefore protected activity. Accordingly, none of the company's subsequent actions was permissible.

The administrative law judge's conclusions may be summarized as follows:

(1) The company violated Sections 8(a)(5) and 8(a)(1) by unilaterally announcing and scheduling the shift changes for the latex department.[6]

(2) The union did not complete Step 5 of the grievance procedure, nor did it make a written request for arbitration.

(3) *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), held that a strike designed, not to modify or terminate a collective bargaining agreement, but "to protest the unfair labor practices of petitioners," *ibid.*

---

**5.** Because of the strike, the schedule change was not implemented.

**6.** Section 8(a)(5) of the National Labor Relations Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees" concerning wages, hours, and other terms and conditions of employment. 29 U.S.C. § 158(a)(5).

Section 8(a)(1) of the Act declares it to be an unfair labor practice to interfere with, re-

strain or coerce employees in the exercise of the right to self-organization, to form, join or assist labor organizations, to bargain collectively and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. 29 U.S.C. § 158(a)(1). "Accordingly, it has been held that violations of sub-sections (2), (3), (4) and (5) are also violations of Section 8(a)(1)." A. Cox & D. Bok, Cases and Materials on Labor Law 143–44 (7th ed. 1969).

at 286, 76 S.Ct. at 359 was protected activity.

The Court underscored two complementary, congressionally-endorsed policies of labor law: one seeking to preserve a competitive business economy, the other seeking to preserve the rights of labor to organize and bargain collectively for better conditions. *Ibid.* 350 U.S. at 279–80, 76 S.Ct. 349. The Court recognized that, assuming fair representation, a collective bargaining agreement could waive a union's right to strike during the term of the contract. However, it was found that, viewed as a whole, the contract in *Mastro Plastics* dealt "solely with the economic relationship between the employers and their employees." *Ibid.,* 350 U.S. at 281, 76 S.Ct. at 357. Accordingly, there was an insufficient basis for implying that the union had contracted not to strike at all, even against an unfair labor practice.

In *Mastro Plastics* the company's initial unfair labor practice was termed "a flagrant example of interference by the employers with the expressly protected right of their employees to select their own bargaining representative." *Ibid.* 350 U.S. at 278, 76 S.Ct. at 355. Relying upon this finding the NLRB has adopted the rule that "only strikes in protest against *serious* unfair labor practices should be held immune from general no-strike clauses." *Arlan's Department Store of Michigan, Inc.,* 133 N.L.R.B. 802, 807 (1961) (emphasis added). On the facts of this case, the company's "unilateral conduct, although found to be an unfair labor practice, was not of such serious nature as to be 'destructive of the foundation on which collective bargaining must rest.'" App. at 416a (opin-ion of administrative law judge, quoting *Mastro Plastics, supra,* 350 U.S. at 281, 76 S.Ct. 349). Therefore, the strike that began on June 7 "was unprotected from its inception." *Ibid.* at 417a.[7]

(4) The company did not violate Sections 8(a)(5) and 8(a)(1) when it rescinded the collective bargaining agreement, because the union previously had breached the contract's no-strike clause.

(5) The striking employees forfeited whatever rights they had had to reinstatement by participating in the unprotected strike. Accordingly, the company did not violate Sections 8(a)(3)[8] and 8(a)(1) by terminating the striking employees.

(6) Because the terminations were lawful, the company did not violate Section 8(a)(5) by withdrawing recognition of the union.

On these conclusions, the administrative law judge found that no remedial action was appropriate and recommended that the complaint be dismissed in its entirety.

By a vote of two-to-one, a three-member panel of the Board affirmed the administrative law judge's rulings, findings and conclusions, and adopted his recommended order. The majority did not issue an opinion. Member Fanning dissented in part and filed an opinion. He agreed that the company's initial action violated Section 8(a)(5). He stated, however, that he interpreted *Mastro Plastics* to permit strikes in protest of any unfair labor practices, not just serious ones; moreover, assuming *Arlan's Department Store* to be the rule, the company's violation of the Act was a serious unfair labor practice. Thus, the company was

7. The General Counsel and the charging party approached this issue differently before the administrative law judge. The union argued that the strike was in protest of a serious unfair labor practice from its inception. The General Counsel, on the other hand, contended that the strike that began on June 7 as an unprotected activity was converted into an unfair labor practice strike, particularly by the company's cancellation of the contract. The administrative law judge rejected the General Counsel's argument, because he found the rescission of the contract was permissible. App. at 419a. Because of the view we take, the distinction between the arguments advanced need not detain us.

8. Section 8(a)(3) of the National Labor Relations Act makes it an unfair labor practice to discriminate in regard "to hire or tenure of employment or any term or condition of employment" on the basis of membership in a labor organization. 29 U.S.C. § 158(a)(3).

not justified in cancelling the contract, terminating the employees, or withdrawing recognition.

## III.

As the case comes to us, the first two conclusions of the administrative law judge do not present difficult issues.

■ First, we find substantial evidence in the record viewed as a whole to support the Board's conclusion that the management-rights clause did not justify the unilateral implementation of the shift changes. Accordingly, we agree with the Board that the company violated Sections 8(a)(5) and 8(a)(1).

■ Second, in its petition for review, the union does not press the contention that it had complied sufficiently with the grievance procedure so that the strike was one authorized by the collective bargaining agreement. In any event, we would agree with the majority of the Board that the union failed to exhaust the grievance procedures and that it did not file a written request for arbitration. Accordingly, the strike was not one authorized by the contract's limited reservation of a right to strike.

The remaining issues are infinitely more complex. We proceed, then, to the questions of whether the union's strike was otherwise protected and, if not, what consequences are appropriate.

## IV.

Petitioner argues that *Mastro Plastics, supra,* stands for the proposition that strikes in protest of unfair labor practices are protected activity, irrespective of the nature of the initial unfair labor practice. Alternatively, petitioner contends that, under the Board's *Arlan's Department Stores* decision, *supra,* the company's unfair labor practice was "serious" and, therefore, the strike was protected activity. The Board takes the position that *Arlan's* controls, and that the Board did not abuse its discretion in finding the company's unfair labor prac-

tice "nonserious". The intervenor-company argues alternatively (a) that it did not commit an unfair labor practice and (b) that, if it did, it was not a serious one.

We decline the invitation to resolve this case by simply pigeon-holing it as within the rule of *Mastro Plastics* or that of *Arlan's.* In *Arlan's,* the Board observed that *Mastro Plastics* "must be understood in its setting". 133 N.L.R.B. at 804. The Board was speaking of the *factual* setting. We agree. However, both *Mastro Plastics* and *Arlan's* also must be understood in terms of their *legal* settings. We perceive fundamental developments in national labor policy since *Mastro* (in 1956) and *Arlan's* (in 1961) that should have commanded the Board's attention. Specifically, the Board did not evaluate whether the company could have avoided abrogating the collective bargaining agreement and terminating the employees had *it* sought to arbitrate the dispute. We turn now to a consideration of the developments in national labor policy which we believe militate against reliance solely on *Mastro Plastics* or *Arlan's* in determining whether the company's post-strike actions were permissible.

### A.

Modern labor policy revolves around the collective bargaining agreement. If the agreement is violated, the aggrieved party may bring suit pursuant to Section 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a). The "substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws", *Textile Workers v. Lincoln Mills,* 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), even if the suit is prosecuted in state court, *Humphrey v. Moore,* 375 U.S. 335, 343–44, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964). *Lincoln Mills* specifically held that a union could obtain specific performance of an employer's promise to arbitrate grievances under Section 301(a),[9] irrespective

---

9. Justices Burton and Harlan disagreed with the proposition that federal law was the sub-

stantive law to be applied in a Section 301 suit, but concurred in the result on the ground

of the requirements of Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107. 353 U.S. at 459, 77 S.Ct. 912. Speaking for the Court, Justice Douglas wrote:

> the Senate Report . . . summed up the philosophy of § 301 as follows: "Statutory recognition of the collective agreement as a valid, binding, and enforceable contract is a logical and necessary step. It will promote a higher degree of responsibility upon the parties to such agreements, and will thereby promote industrial peace."

Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike. Viewed in this light, the legislation does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way.

To be sure, there is a great medley of ideas reflected in the hearings, reports, and debates on this Act. Yet, to repeat, the entire tenor of the history indicates that the agreement to ar-

bitrate grievance disputes was considered as *quid pro quo* of a no-strike agreement. And when in the House the debate narrowed to the question whether § 301 was more than jurisdictional, it became abundantly clear that the purpose of the section was to provide the necessary legal remedies.

*Ibid.*, 353 U.S. at 454–55, 77 S.Ct. at 917.

### B.

■ Three years after the *Lincoln Mills* decision, in the *Steelworkers Trilogy*[10] the Court enunciated the now well-known presumption of arbitrability for labor disputes:[11]

> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960) (footnote omitted). Thus, the arbitral forum is the primary arena for the settlement of labor disputes.[12] Murphy

that "[t]he power to decree specific performance of a collectively bargained agreement to arbitrate finds its source in § 301 itself, and in a Federal District Court's inherent equitable powers, nurtured by a congressional policy to encourage and enforce labor arbitration in industries affecting commerce." 353 U.S. at 460, 77 S.Ct. at 919. (footnotes omitted). Justice Frankfurter filed his classic dissent.

10. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

11. As the Court stated in *Gateway Coal Co. v. UMW*, 414 U.S. 368, 377, 94 S.Ct. 629, 636, 38 L.Ed.2d 583 (1974), the "federal policy favoring arbitration of labor disputes is firmly grounded in congressional command. Section 203(d) of the Labor Management Relations Act, 29 U.S.C. § 173(d), states in part:

> Final adjustment by a method agreed upon by the parties is declared to be the

desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement."

12. The NLRB itself has adopted a policy whereby it defers 8(a)(5) cases to the arbitral process when the collective bargaining agreement provides for arbitration. *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971). Those circuits which have reviewed this policy have embraced it. *Local 2188, IBEW v. NLRB*, 161 U.S.App.D.C. 168, 494 F.2d 1087, *cert. denied*, 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61 (1974); *Associated Press v. NLRB*, 160 U.S.App.D.C. 396, 492 F.2d 662 (1974); *Nabisco, Inc. v. NLRB*, 479 F.2d 770 (2d Cir. 1973); *see* cases cited in *Associated Press, supra*, 492 F.2d at 668 n.24. *But cf. NLRB v. Railway, Airline & Steamship Clerks,* 498 F.2d 1105, 1109–10 (5th Cir. 1974). We have not yet had occasion to address the merits of the *Collyer* doctrine and hereby express no opinion thereon. *See generally* Murphy & Sterlacci, *A Review of the National Labor Relations Board's Deferral Policy,* 42 Fordham L.Rev. 291 (1973).

& Sterlacci, *A Review of the National Labor Relations Board's Deferral Policy*, 42 Fordham L.Rev. 291, 300 (1973). As the Court recently observed, the *Steelworkers Trilogy* also elaborated the basis for the policy—"that commercial arbitration and labor arbitration have different objectives. In the former case, arbitration takes the place of litigation, while in the latter 'arbitration is the substitute for industrial strife.'" *Gateway Coal Co. v. UMW*, 414 U.S. 368, 378, 94 S.Ct. 629, 637, 38 L.Ed.2d 583 (1974), quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra*, 363 U.S. at 578, 80 S.Ct. 1347.

## C.

*Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), extended the theories of both *Lincoln Mills* and the *Steelworkers Trilogy*. *See ibid.* at 241–44, 248. Reasoning that the literal, anti-injunction terms of the Norris-LaGuardia Act must be accommodated with the subsequently enacted Section 301 of the Labor Management Relations Act and the purposes of labor arbitration, the Court held that Section 301 authorized injunctions against strikes in violation of contracts that called for arbitration of the underlying grievances. In so ruling, the Court emphasized that "consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." *Ibid* at 250, 90 S.Ct. at 1592.

Several threads of rationale run through *Boys Markets*. First, the importance of arbitration "as an instrument of federal policy for resolving disputes between labor and management". *Ibid.*, 398 U.S. at 243, 90 S.Ct. at 1588. Second, the availability, at least theoretically, of disparate remedies in state as opposed to federal courts under then-existing law. *Ibid.*, 398 U.S. at 243–46, 90 S.Ct. 1583. Third, the reaffirmation that a no-strike clause is a *quid pro quo* for an employer's agreement to submit disputes to arbitration, coupled with the re-alization that if the no-strike clause were not enforceable, there would be little incentive for management to agree to arbitration. *Ibid.*, 398 U.S. at 247–48, 90 S.Ct. 1583. Fourth, the belief that an accommodation between the Norris-La Guardia Act and Section 301 was appropriate because "[a]s labor organizations grew in strength and developed toward maturity, congressional emphasis shifted from protection of the nascent labor movement to the encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes." *Ibid.* at 251, 90 S.Ct. at 1593.

Thus, *Boys Markets* sanctioned judicial enforcement of a no-strike clause given as a *quid pro quo* for an arbitration clause that is specifically enforceable on the authority of *Lincoln Mills*; so viewed, it is the corollary of *Lincoln Mills*. At the same time, a *Boys Markets* injunction is predicated on submission of the underlying dispute to the arbitral forum; accordingly, *Boys Markets* advances the *Steelworkers* principles as well.

## D.

The *Boys Markets* Court characterized its opinion as "a narrow one"; the Court dealt "only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure," 398 U.S. at 253, 90 S.Ct. at 1594, and an explicit no-strike clause. The more recent *Gateway Coal Co. v. UMW, supra,* indicates that, although the *Boys Markets* holding may have been narrow, its impact is to be far greater. Specifically, the *Gateway* Court held that "injunctive relief also may be granted on the basis of an implied undertaking not to strike", as well as a specific no-strike clause, 414 U.S. at 381, 94 S.Ct. at 638. Second, the Court held that this court had erred in limiting the presumption of arbitrability to disputes over economic matters; strikes precipitated by safety disputes also could

be enjoined. *Ibid.* at 379–80, 94 S.Ct. 629.[13]

### E.

As we understand these recent Supreme Court teachings, the basic tenets of contemporary labor policy may be summarized as follows:

■ (a) Today's interdependent and technologically advanced economy dictates that labor-management relations be as peaceful as possible. *See* Gould, *On Labor Injunctions, Unions, and the Judges*: *The* Boys Markets *Case*, 1970 Sup.Ct.Rev. 215, 267 (P. Kurland ed.) [hereinafter cited as Gould].

■ (b) Where labor and management agree on a forum for the peaceful resolution of disputes, that agreement should be honored and may be enforced by an injunction, mandating resort to that forum. *Boys Markets, supra*; *see The Supreme Court, 1969 Term*, 84 Harv.L.Rev. 30, 199 (1970); Note, *Giving Strength to the No-Strike Clause: Accommodation to Allow Federal Injunctions*, 46 Notre Dame Law. 526, 541 (1971); Note, *The New Federal Law of Labor Injunctions*, 79 Yale L.J. 1593, 1599 (1970).

■ (c) Arbitration is a favored alternative forum for dispute resolution. *Gateway, supra*, 414 U.S. at 377, 382, 94 S.Ct. 629; *Sinclair Refining Co. v. Atkinson*, 370 U.S. 195, 226, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting) ("a kingpin of federal labor policy"); *Arlan's supra*, 133 N.L.R.B. at 808; *The Supreme Court, 1969 Term*, 84 Harv.L. Rev. 30, 199 (1970); Note, *Labor Injunctions*, Boys Markets, *and the Presumption of Arbitrability*, 85 Harv.L.Rev. 636, 637 (1972).

■ (d) Congressional emphasis in labor legislation has shifted "from protection of the nascent labor movement to the encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes." *Gateway, supra*, 414 U.S. at 381, 94 S.Ct. at 638; *Boys Markets, supra*, 398 U.S. at 251, 90 S.Ct. 1583, *see* Gould 236; *The Supreme Court, 1969 Term*, 84 Harv.L.Rev. 30, 200–01 (1970).

In our prior decisions, we have sought to adhere to these principles. *Parade Publications, Inc. v. Philadelphia Mailers Union No. 14*, 459 F.2d 369, 374 (3d Cir. 1972), recognized the limitation to *Boys Markets*, namely "that arbitration should be encouraged by permitting judicial enforcement of a 'no-strike' clause when the underlying issue is arbitrable, but that there should be no injunction if the underlying dispute is not arbitrable." This court, however, has not been hesitant to find arbitrability. For example, in *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs Local 926*, 502 F.2d 321 (3d Cir.) (in banc), *cert. denied*, 419 U.S. 1049, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974), a labor agreement contained a no-strike clause and a provision that the agreement would not be violated if "an employee honored a primary picket line." *Ibid.* at 323. The parties disagreed whether the picket line honored was primary or secondary. Reasoning that "[r]equiring arbitration does not nullify the union's right to honor a primary picket line, but only suspends the exercise of the right until its existence is established by an arbitrator's decision," *ibid.* at 324, we held that the dispute was covered by the contractual undertaking to arbitrate. Accordingly, we affirmed the district court's issuance of a *Boys Markets* injunction. *Island Creek Coal Co. v. UMW*, 507 F.2d 650 (3d Cir.), *cert. denied*, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975), extended this rule to a labor agreement in which there was neither an express no-strike clause nor a contractual reference to honoring picket lines. *Ibid.* at 652.[14] More recently, in

---

13. *Gateway* led one commentator to conclude that the Court had added to the "presumption of arbitrability" a "presumption of enjoinability for all labor disputes". 63 Geo.L.J. 275 (1974).

14. *Island Creek* articulated a significant distinction:

Whatever difficulties there may be concerning the scope of the remedy recognized in *Boys Markets*, there would, we assume,

the context of a Section 301 damage action, we held that the question of whether the collective bargaining agreement had been repudiated was one for the arbitrator. *Controlled Sanitation Corp. v. Dist. 128, International Ass'n of Machinists,* 524 F.2d 1324, 1331 (3d Cir., 1975), *cert. denied,* —— U.S. ——, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976).

We turn to consider, on the facts of the instant case and with respect to the company's post-strike actions, the appropriate accommodation between these general principles and the older rules of *Mastro Plastics* and *Arlan's.*

### V.

Here, first the union and then the company resorted to the tooth and claw of industrial warfare, rather than availing themselves of procedures provided in their collective bargaining agreement and encouraged by the congressionally mandated national labor policy. The union failed to complete the grievance procedure and to invoke arbitration; instead it struck to protest what it considered an unfair labor practice. The company disdained the available arbitral forum and ultimately resorted to rescis-

sion of the contract, to discharge of the employees and to termination of the collective bargaining relationship. A more primitive, abrasive and disrupting example of labor-management relations is difficult to imagine. Indeed, the avoidance of such traumatic ruptures in industrial relations is the precise aim of the national labor policy. Yet the Board and the intervenor-company would have us hold that the national labor policy will sanction the company's ultimate actions.

### A.

The Supreme Court has instructed since *Lincoln Mills* that a union's no-strike pledge is usually given as a *quid pro quo* for the company's promise to arbitrate specified disputes. The union can compel arbitration, *Lincoln Mills, supra,* and the employer can enjoin a strike in violation of the no-strike clause, *Boys Markets, supra.* When an employer seeks to enjoin such a strike, the task of the court is two-fold: (a) to determine whether the parties have agreed to arbitrate the underlying dispute;[15] (b) if so, whether the employer is entitled to an injunction.[16] *Island Creek*

be a high degree of unanimity in support of the proposition that if the contract gives the union and the employees the right to grieve and arbitrate a given dispute that remedy must be pursued in preference to a work stoppage. Thus the initial inquiry should not be whether the employer is entitled to an injunction, but rather, whether the underlying dispute is one which the union and the employees could grieve and arbitrate.

507 F.2d at 652 (citation omitted). Subsequently, we gave substance to this distinction by vacating a *Boys Markets* injunction while endorsing the district court's ordering of resort to the grievance procedures. *Jones & Laughlin Steel Corp. v. UMW,* 519 F.2d 1155, 1158–59 (3d Cir. 1975).

15. This task in turn involves determining (a) whether the parties agreed to arbitrate generally and (b) whether the agreement to arbitrate is susceptible of an interpretation that covers the specific dispute.

16. The district court must "consider whether issuance of an injunction would be warranted under ordinary principles of equity—whether breaches are occurring and will continue, or have been threatened and will be committed;

whether they have caused or will cause irreparable injury to the employer; and whether the employer will suffer more from the denial of an injunction than will the union from its issuance." *Boys Markets, supra,* 398 U.S. at 254, 90 S.Ct. at 1594; *see Gateway, supra,* 414 U.S. at 387–88, 94 S.Ct. 629. We have suggested previously that a rupture in the *status quo* of working conditions during grievance and arbitration proceedings may constitute irreparable harm to a union *qua* union. *Newspaper Delivery Drivers, Local 211 v. Pittsburgh Press Co.,* No. 72–2141 (3d Cir., Dec. 26, 1972). We have no occasion at this time to decide whether a company could prove irreparable injury on an analogous theory.

*See also* Note, *The New Federal Law of Labor Injunctions,* 79 Yale L.J. 1593, 1599 (1970) ("the power should be limited to those situations where the policies of ensuring industrial peace through arbitration and of promoting freedom of contract by enforcing collective bargaining agreements *both* clearly support the granting of an injunction"); 88 Harv.L. Rev. 463, 470 (1974) (suggesting as a further requirement a finding of probable success on the merits).

*Coal Co. (supra* n. 14); *see Gateway, supra,* 414 U.S. at 374, 94 S.Ct. 629.

■ Given *quid pro quo* arbitration and no-strike provisions in a collective bargaining agreement, we would have no difficulty in concluding that an employer's failure to seek a *Boys Markets* injunction against a strike violating a no-strike clause would be an appropriate factor to consider in determining whether subsequent actions were permissible under the National Labor Relations Act. Thus, the availability of a *Boys Markets* injunction effects a *pro tanto* modification of the *Arlan's* rule. A contrary conclusion would be a total perversion of the national labor policy espoused by Congress and the Supreme Court.

### B.

[11] Here, however, the arbitration process was elective, not mandatory. The arbitration provision of the contract, *see* n. 4 *supra,* was not coextensive with the no-strike clause. Arbitration could occur only upon written consent of both the union and the company. We are also mindful that "[n]o obligation to arbitrate a labor dispute arises solely by operation of law." *Gateway, supra,* 414 U.S. at 374, 94 S.Ct. at 635, *see Local 103, Electrical, Radio & Machine Workers v. RCA Corp.,* 516 F.2d 1336, 1339 (3d Cir. 1975). Accordingly, we agree that a *Boys Markets* injunction against the strike and requiring arbitration was unavailable to the company as a remedy.

Although arbitration was not compulsory, compliance with the grievance procedure was mandatory. The preamble to the grievance article stated in pertinent part:

It is the intent of this article to provide an efficient means of satisfactorily adjusting complaints and grievances at the job level. To that end it is agreed that the following steps shall be followed in numerical order so that both the Union and the Company strive for an early settlement at the lowest level within this procedure.

App. at 296a. The contract also barred strikes, *inter alia,* unless and until the grievance procedure had been completed. *See* pp. 268, 270 *supra.* Thus, the contract contained a more limited *quid pro quo* arrangement than usual: the union agreed not to strike during the grievance procedure; in return, the company agreed to follow the grievance procedure and to "strive for an early settlement at the lowest level within this procedure." As the dispute developed, however, the union struck on the day the company planned to implement the schedule change; the company did not write its Step 4 "disposition" until several days later. App. at 150a; 320a–24a. The company took no further action with regard to its duty to follow the grievance procedure.[17] Significantly, it did not seek specific enforcement of the agreement to follow the grievance procedure. *See Lincoln Mills, supra,* 353 U.S. at 454, 77 S.Ct. 912, 1 L.Ed.2d 972; *Jones & Laughlin Steel Corp. v. UMW,* 519 F.2d 1155 (3d Cir. 1975).

Furthermore, even though *Boys Markets* was unavailable to the company to compel arbitration, the arbitral forum was not closed to the company. Arbitration was available when the grievance procedure "fail[ed] to resolve a problem involving . . . the interpretation of any provision of this agreement." The underlying dispute in the instant case revolved around the interpretation of the management-rights clause. Therefore, the problem clearly was sus-

---

The procedural requirements of Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107, remain applicable so far as consistent with the policies of Section 301. *Celotex Corp. v. Oil, Chemical & Atomic Workers,* 516 F.2d 242, 246 (3d Cir. 1975). For the proposition that Sections 7–12 inclusive of the Norris-LaGuardia Act, 29 U.S.C. §§ 107–112, provide safeguards against improper restraining orders see Note, *The New Federal Law of Labor Injunctions,* 79 Yale L.J. 1593, 1606–08 (1970).

17. We do not deem it necessary to reach the question whether the company could have obtained a *Boys Markets*-type injunction pending compliance with the compulsory grievance provisions.

ceptible to resolution in the arbitral forum. *See* n. 15 *supra*. The only stumbling block to submission of the dispute to arbitration was the consent of the parties. The union had indicated its desire to arbitrate; the company never affirmatively sought arbitration.

The company did send several letters to union members, *inter alia,* asking them to encourage their leaders "to return to the legal and . . . right means of solving this problem." *See* App. at 409a. We see nothing in these letters approaching a written consent to arbitration. *See ibid.* at 341a–47a. On July 26, 1971, the company wrote the Connecticut Labor Commissioner a letter stating, *inter alia,* "The Dow Chemical Company hereby notifies you, as Labor Commissioner of the State of Connecticut, of its willingness to submit the labor dispute resulting in said strike or walkout to arbitration or mediation." *Ibid.* at 348a. There is nothing in the record to indicate that the union received this communication which might be read as a consent to arbitration sufficient under the collective bargaining agreement before the company terminated the collective bargaining agreement on August 9, 1971. *See ibid.* at 162a–65a, especially at 164a. *See also ibid.* at 209a–10a.

Twice during the Step 4 meeting the union representative suggested that the issue be submitted to arbitration immediately, bypassing Step 5. In one case the company representative said "stick to the grievance procedure", and in the other the company representative did not give a direct answer. *Ibid.* at 145a–48a; 197a–201a. At the end of the Step 4 meeting, the union representative told the company representative not to put the schedule change into effect, but to settle the dispute in court or through arbitration. *Ibid.* at 200a. The company pursued neither alternative.

Accordingly, we believe that, although *Boys Markets* was unavailable to the company to compel arbitration, this con-

clusion begs the pivotal question: whether the company, having failed to take positive steps to have the dispute resolved peacefully, can build a sanctuary for subsequent actions in derogation of its previously harmonious relationship with the union. As a practical matter, had the company sought a peaceful and orderly resolution of the underlying dispute, it is highly probable that the union would have at least suspended the strike.

Reducing this case to its bare essentials, we observe that labor and management agreed to grieve disputes and to submit disputes to the arbitral forum upon consent; that management never sought to force completion of the grievance procedure; that management did not communicate to the union before terminating the contract its consent to arbitrate; and that industrial strife ensued. The company could have compelled completion of the grievance procedure or communicated to the union its consent to arbitration, and thereby avoided these traumatic ruptures. We therefore hold that, in evaluating the company's post-strike actions, the Board should have considered as a factor the company's failure to seek peaceful resolution through the grievance procedure and in the arbitral forum.

## C.

The decision we reach today is guided in the first instance by jurisprudential guideposts in recent Supreme Court pronouncements on national labor policy. But prudential considerations also have influenced our disposition. We have grave doubts that the Board's resort to the *Mastro Plastics/Arlan's* formula furthers the cause of industrial peace. The principals to a labor dispute cannot know with any degree of certainty whether the Board will deem a company's actions unfair labor practices and, if so, whether it will label them "serious" or "nonserious". The answers, like beauty, may lie in the eye of the beholder.[18] Under the

---

18. The record before us demonstrates that no bright line of demarcation separates the two types of unfair labor practices. Of three distinguished, expert members of the Board, two found the company's unilateral decision to change the work shifts to be a "nonserious"

Board's decision in this case, the union that chooses to strike because it believes (1) the company has committed an unfair labor practice and (2) it is a "serious" one, may find itself ousted as a collective bargaining agent and its members terminated if a majority of the Board, upon detached reflection, disagrees with only the second conclusion.

The Board has said that the "test [it] has to apply in most of its cases [is] experience, good sense, and good judgment"; "[i]n this field, lines between the licit and illicit can rarely be drawn clearly in advance. And in the penumbral areas which are omnipresent, there is no substitute for niceties of judgment." *Arlan's, supra,* 133 N.L.R.B. at 807. While we agree with these sentiments in principle, we emphasize the importance of constricting the numbers and contours of "penumbral areas". Industrial peace requires that companies and unions alike extract maximum stability, predictability, and reckonability from labor board decisions. Labor and management have the right to understand labor law in the context of a paraphrase of Holmes' aphorism: "The prophecies of what the [NLRB] will do in fact, and nothing more pretentious, are what I mean by the law [of labor]." Holmes, *The Path of the Law,* 10 Harv.L.Rev. 457, 461 (1897). Under our decision, a union will still be placed on the horns of a dilemma when it believes the employer has committed an unfair labor practice. The company faced with a resultant strike, however, will know that it should take certain precautions before resorting to such self-help as cancellation of the contract, termination of employees and refusal to recognize the union.

■ While seeking to further the interests of stability, predictability and reckonability in the area of labor law, our decision does not detract from the important role of the Board in formulat-

ing and administering national labor policy. We recognize that a dispute, such as that underlying this case, involving a claimed unfair labor practice is within the Board's primary jurisdiction. *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). As noted above, however, the Board itself has adopted a policy of deferring certain Section 8(a)(5) charges to the arbitral forum. *See* n. 12 *supra.* Moreover, although an issue may be within the Board's exclusive jurisdiction, if it arises in the context of a breach of the collective bargaining agreement, it falls within the jurisdiction of the federal courts under Section 301. *Smith v. Evening News Ass'n,* 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962). Under our decision, the Board may play a key role in future disputes such as that at bar. If a union strikes to protest an alleged unfair labor practice, and if the company counters by seeking a *Boys Markets* injunction, the federal court may require the posting of a bond, may preliminarily enjoin the strike, and may solicit the expertise of the Board in the form of an amicus brief. *See* Gould 257–58. Such a solution will further the national labor policy favoring peaceful resolution of most labor disputes through the arbitral forum, while safeguarding the union's interests in protecting its organizational integrity from major employer unfair labor practices as recognized in *Mastro Plastics, supra.*

## VI.

■ One other aspect of the Board's decision requires comment. The administrative law judge found that the union's strike in breach of the contract justified the company's unilateral cancellation of the entire collective bargaining agreement. As primary authority, he relied on *Marathon Elec. Mfg. Co.,* 106 N.L.R.B. 1171 (1953), *enforced sub nom.*

violation of Section 8(a)(5). A third member found that, "even applying the test of 'experience, good sense, and good judgment' of the majority opinion in *Arlan's,* the unfair labor practice committed by [the company] must be

judged sufficiently serious to warrant the employees taking concerted action outside the grievance-arbitration provisions of the contract." App. at 442a (Member Fanning, dissenting).

*United Elec., Radio & Machine Workers v. NLRB,* 96 U.S.App.D.C. 46, 223 F.2d 338 (1955), *cert. denied,* 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956). Just as we believe recent developments in labor law have depleted the force of the *Mastro Plastics/Arlan's* formulation, so also we believe that strict application of the doctrine of material breach derived from contract law is inconsistent with contemporary national labor policy.

At the outset we observe that *Children's Rehabilitation Center, Inc. v. Service Employees,* 503 F.2d 1077 (3d Cir.), *cert denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974), is not to the contrary. There, the union had acquiesced in the company's termination of the labor contract, *ibid.* at 1079, and the sole issue before the court was whether the employer could recover, in a Section 301 suit, damages for the period between the initial breach of the agreement and the company's termination. Our narrow holding was that "the loss of the right [the company] otherwise would have to collect damages for a breach is not an unfair price for an employer to pay if it insists upon total and permanent relief from the obligations it accepted under a labor contract." *Ibid.*

 In the more general circumstances presented here, we agree with the views expressed by Chief Judge Seitz. *Ibid.* at 1080. Indeed, the concerns there expressed are identical to those more fully set forth in Part IV *supra.* Accordingly we disapprove the rule that holds a strike in breach of a contract automatically gives the employer the right to terminate the contract. As Professor Cox observed some years ago in criticizing the *Marathon Electric* rule:

> A collective bargaining contract is made to be broken. The number of people involved, both as employees and as supervisors, makes large and small violations inevitable. This is one reason for the grievance procedure and arbitration. Collective agreements are negotiated for substantial periods after much travail. There are enormous pressures to reach agreement. There will be no rules to govern the enterprise if the contract is set aside. These are proper factors to evaluate in determining whether a breach is material. They *argue for continuing the contract and leaving the injured party to his legal or contractual remedies.* Consequently, I am skeptical of the trend toward holding that a strike in breach of contract automatically gives the employer the right to terminate the agreement. There would seem to be room for judgment based upon the length of the strike, the number of employees affected, the injury to the employer, *the degree of fault upon the part of the union,* and the likelihood that the contract will be honored for the remainder of its term.

Cox, *The Legal Nature of Collective Bargaining Agreements,* 57 Mich.L.Rev. 1, 18–19 (1958) (footnote omitted and emphasis added).[19]

Here, the company had both legal and contractual remedies available to it short of contract termination. Legally, it could have compelled completion of the grievance procedure or filed a Section 301 damage suit. Under the contract, it could have taken affirmative steps to have the underlying dispute submitted to arbitration. It did neither. In its brief, the NLRB appears to cast total blame for this rupture in labor relations on the union. The Board says the union "refus[ed] to fully process the grievance [thereby] preclud[ing] an orderly resolution of the dispute." Brief for NLRB at 29; *see ibid.* at 30. This analysis, however, does not reach "the *degree* of fault upon the part of the union". As recited at length in Part V *supra,* it was the company's reluctance to arbitrate which precluded a peaceful resolution of the underlying dispute. Indeed, it was the company's unfair labor practice that pre-

---

**19.** *See also* Feller, *A General Theory of the Collective Bargaining Agreement,* 61 Calif.L. Rev. 663 (1973), especially at 797–99 & n.522.

cipitated the strike. Now, it is the company's theory which would pervert the national labor policy. We decline the invitation to contribute to such a result. In short, analogies between contract principles and the law of labor agreements are helpful to a point; when an analogy would dictate a result contrary to the paramount interests in labor peace, however, it should not control. *See United Steelworkers of America v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 578–81, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

## VII.

To summarize, the polestars of the national labor policy today are that industrial strife is to be avoided and that arbitration or alternative peaceful conflict resolutions are to be favored. The contract between the union and the company prohibited strikes unless and until a grievance and arbitration procedure had been exhausted. The union struck prematurely. The company then joined the union in resort to the tooth and claw of industrial warfare when it might as easily have turned the other cheek and taken affirmative steps to get the dispute back in the available arbitral forum. The Board reasoned that the strike was an unprotected, material breach of the contract because the company's initial unfair labor practice was "nonserious"; it overlooked the company's failure to resort to available, peaceful alternatives. In light of recent trends in labor policy, we find error in this oversight. We, therefore, will grant the petition to review the order of the Board and will deny the cross-application for enforcement of the Board's order. In the view we take, we do not disturb the Board's conclusion that the company violated Sections 8(a)(5) and 8(a)(1) by unilaterally announcing and scheduling a change in the work schedule of latex department employees. We will remand for reconsideration of all other aspects of the proceedings in accordance with the foregoing.