**BREWERY DRIVERS & HELPERS LOCAL NO. 133 OF ST. LOUIS, MISSOURI, Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Appellant,**

v.

**GREY EAGLE DISTRIBUTORS, INC., Lismark Distributing Co., Lohr Distributing Co., Inc., B.A.M., Inc., R.M.W., Inc., St. Louis Stag Sales, Inc., St. Louis Beer Wholesalers Assn. of St. Louis, Missouri, Appellees.**

No. 78–1036.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1978.

Decided Feb. 7, 1979.

Rehearing and Rehearing En Banc Denied Feb. 28, 1979.

Jerome J. Duff of Jerome J. Duff & Associates, Inc., St. Louis, Mo., for appellant; James E. Heckel, St. Louis, Mo., on brief.

John P. Emde of Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for appellees; Fred Leicht, Jr., St. Louis, Mo., on brief.

Before HEANEY and STEPHENSON, Circuit Judges, and VAN SICKLE,* District Judge.

HEANEY, Circuit Judge.

The Brewery Drivers & Helpers Local No. 133 appeals from a judgment of the District Court for the Eastern District of Missouri dismissing its complaint. We affirm.

The Union signed a collective bargaining agreement with the individual appellees in 1973 which was to expire on February 29, 1976.[1] Negotiations on a new agreement began in January, 1976. During the bargaining, the employer sought to modify Article XIX and XX so as to permit drivers to haul more cases of beer in a single load. These articles provided in part:

### ARTICLE XIX

*Work Described*

Section 1.—The work of truck drivers, chauffeurs, warehousemen and helpers shall consist of loading and unloading of all city delivery trucks and city delivery trailers (except as mutually agreed) and the delivery of beer and beverages to customer accounts in Greater St. Louis and Vicinity when such accounts are serviced directly by the Employers and not through beer wholesalers or distributors[.] * * *

Sec. 2.—Trucks and Trailers shall be loaded with all due regard for the safety of the operator and shall not carry more than 1,000 cases of beer to retail outlets (such to be classed as a "load limit").

Sec. 3.—A load, regardless of delivery, shall consist of, not to exceed 210 packages or its equivalent without a helper.

---

* The Honorable BRUCE M. VAN SICKLE, United States District Judge for the District of North Dakota, sitting by designation.

1. We need not decide whether the St. Louis Beer Wholesalers Association is a proper party to this action.

Trucks may make more than one trip per day if time permits, provided that where an employee's deliveries exceed 210 packages he will be supplied a helper.

## ARTICLE XX

### *Helpers*

Section 1.—Drivers shall be furnished with helpers, where by mutual consent between the Union and the Employer it is deemed necessary. In cases of inability to agree either the Union or the individual Employer may, upon due notice, refer the matter to arbitration.

\*    \*    \*    \*    \*    \*

Sec. 4.—* * * When there are in excess of five hundred (500) cases of beer on city trucks or trailers for city delivery, three men shall be required up to 1,000 cases. Further, where trucks and trailers in the city pick up empty cases in excess of 500, three men shall be required up to twelve hundred (1,200) cases.

On Thursday, April 8, 1976, each of the appellees notified the Union that " * * * it is not probable that further negotiations will result in an agreement. We are therefore terminating further negotiations and declare that the terms and provisions of the Collective Bargaining Agreement which expired on February 29, 1976 shall no longer be continued in full force and effect subsequent to [April 12, 1976]." The termination notice was presumably intended to conform with Article XL of the Agreement which provided in part as follows:

1.—The Parties shall continue to bargain and negotiate in good faith in an effort to reach a complete Agreement and understanding covering the terms and provisions of a new contract to take the place of this one or a contract containing the desired modifications, and such negotiations shall continue until either a complete Agreement and understanding is reached or until either or both Parties conclude that it is not probable that further negotiations will result in an Agreement.

2.—All of the terms and provisions of this contract shall be continued in full force and effect and extended from the termination dtae [sic] hereof to such time as the parties either enter into a new Agreement, or Agreement containing the desired modifications, or terminate further negotiations in the manner above mentioned.

On Friday, April 9, 1976, the Union acknowledged the notification and rejected the attempted termination. It stated in a letter to the defendants:

This Union is convinced that further bargaining and negotiating in good faith in an ongoing effort to reach a complete Agreement and understanding covering the terms and provisions of a new contract should continue. We are prepared to meet with you and your representatives for this purpose.

Our members employed by the various involved Companies have been instructed to report and to be available for work in a normal fashion. Their continuing employment must be under all of the terms and conditions of the 1973–76 labor agreement as it is now extended.

It also called for continuing negotiations in an effort to reach a new agreement.

Later the same day, the Union was told that each of the companies had ordered their employees to load each delivery truck with 250 cases of beer. The Union notified its members that they should refuse to "overload" the delivery trucks (250 cases) and should refuse to work and that if the "overload" orders were not rescinded, they should leave the employer's premises. The orders were not rescinded and the Union members began picketing the appellees on Monday morning, April 12.

The Union simultaneously filed unfair labor practice charges with the National Labor Relations Board. It charged that the Association had refused to bargain by sending copies of its final proposal to individual employees in a form that was allegedly different from the final proposal presented to the Union negotiating committee.

The strike continued for approximately eleven weeks. A new contract was then agreed to and the drivers returned to work. Subsequent to their return, the Association signed a settlement agreement terminating the National Labor Relations Board proceedings. It provided in part as follows:

WE WILL NOT refuse to bargain collectively and in good faith with Brewery Drivers and Helpers Local Union No. 133, * * * the exclusive bargaining representative of our employees, by unilaterally implementing changes in the delivery load limits of our employees without bargaining collectively with [the] Union * * to an impasse about such changes.

WE WILL NOT in any like or related manner interfere with, restrain or coerce our employees in the exercise of the rights guaranteed in Section 7 of the National Labor Relations Act.[2]

The Association also agreed to post appropriate notices. The settlement agreement contained a non-admission clause which read as follows:

By entering into this Settlement Agreement, the Charged Party does not admit that it has committed any unfair labor practices.

Sometime after the men returned to work, the Union commenced an action in the District Court for the Eastern District of Missouri. It alleged in its complaint that the appellees, by ordering employees to commence to load and deliver beer in excess of the daily limitations set forth in Articles XIX and XX of the labor agreement between the parties, had breached the terms and conditions of the Agreement. It further alleged that the breach of the Agreement required the employees to terminate their work for the appellees, that they did not return to work for eleven weeks and that they lost a total of $1,084,000 in wages during that period.

Subsequent to the filing of the complaint, the employers filed a motion to dismiss the complaint, and the Union filed a motion for summary judgment. The District Court granted the employer's motion to dismiss and denied the Union's motion for summary judgment. It held that the employers had not breached the contract and had properly terminated it. It further held that the Union had no right to reject the termination; and that when the strike began on April 12, 1976, no contract was in force. The court stated:

The facts demonstrate conclusively that no breach occurred before the termination. The action taken by defendants on Friday, April 9, 1976 in ordering two hundred fifty (250) cases placed on each truck did not conflict with the terms of the contract. It was not possible that the trucks would be used for delivery until Monday, April 12th. On that day, the contract was no longer in force. Thus, even had defendants ordered delivery (which did not occur because of the strike) there would have been no breach.

It is immaterial whether the Court characterizes these facts as adequate to grant summary judgment to defendants or as reason to dismiss for lack of jurisdiction. * * * Plaintiff may not prevail in this action and it will be dismissed. [Citation omitted.]

The Union appeals from the dismissal. It contends that it was improper because there were disputed issues of fact with respect to the question of whether a breach of the contract occurred before the termination. It is unnecessary for us to determine whether the District Court erred in dismissing the complaint on the grounds that it did because, in our judgment, the complaint failed to state a cause of action for another and a more important reason. To put the matter simply, a Union cannot bring an action for wages lost by its members during a strike called by the Union to protest an alleged breach of a collective bargaining agreement containing an arbitration clause similar to the one in the

2. During its investigation, the Board apparently determined that the conduct described in the notice was the only conduct which arguably constituted an unfair labor practice.

agreement between these parties[3] unless the Union has first agreed to submit the dispute to arbitration pursuant to the arbitration provisions of the collective bargaining agreement and the employer has rejected that offer.

■ When the employers notified the Union that they were terminating the collective bargaining agreement and were instructing their employees to load trucks with 250 cases of beer rather than 210, the Union could have demanded that the validity of the termination notice and the validity of the order to "overload" the trucks be submitted to arbitration. *See Drake Bakeries v. Local 50*, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1342, 4 L.Ed.2d 1409 (1960); *Controlled Sanitation Corp. v. Dist. 128*, 524 F.2d 1324 (3d Cir. 1975), *cert. denied*, 424 U.S. 915, 96 S.Ct. 1114, 47 L.Ed.2d 319 (1976). It did not do so, choosing instead to use its economic strength. It was free to make the choice as the agreement specifically provides that it could use economic power in support of its demands and such action was not a violation of the contract, notwithstanding any other provision of the contract when the employer had previously selected that method of resolving the dispute. *See Rae v. United Parcel Service of Pa.*, 356 F.Supp. 465 (E.D.Pa.1973).

The Union argues strenuously that its position that it can recover damages for the employers' "breach," notwithstanding its decision to strike, is supported by *United Steelworkers of Am., AFL–CIO–CLC v. N. L. R. B.*, 530 F.2d 266 (3d Cir.), *cert. denied*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976). In that case, the employer had unilaterally implemented a shift change. The Union, without exhausting the grievance and arbitration procedures, instituted a strike to protest the company's action. Thereafter, the company terminated the employees. The Union then filed an unfair labor practice charge alleging a refusal to bargain. It asked the Board to require the company to reinstate the employees. The National Labor Relations Board refused to require the company to reinstate them even though it found that the employer's action constituted an unfair labor practice. It took this action because the Union had struck rather than asked that the validity of the shift change be submitted to arbitration. The Third Circuit remanded the case to the Board instructing it to *consider* the company's failure to demand arbitration as a factor in determining whether the company had committed an unfair labor practice in terminating the employees. It reasoned:

**3.** Article XV, pertaining to grievance and arbitration, of the collective bargaining agreement provided in part:

Section 1.—In the event of a dispute, difference or disagreement between the Employer and the Union concerning the interpretation or application of the terms of this Agreement, representatives of the Employer and the Union shall make an honest and sincere effort to adjust the same in an amicable manner. In the event, however, of the inability of the Company and the Union to reach an agreement on the issue or issues in dispute, the question may, at the option of either party, be submitted for arbitration in the following manner:

Sec. 2.—Either party may demand arbitration and shall give five (5) days advance notice, in writing, to the other Party of its desire to arbitrate. The dispute shall be submitted to the Board of Arbitration of three (3) persons. One person shall be selected by the Union, one by the Employer, and the third by the first two. Designations of the persons selected by the Union and by the Employer must be made within ten (10) days after the demand for arbitration is made, and the two designees must select the third arbitrator within ten (10) days thereafter; provided, however, that in the event that the first two arbitrators cannot agree upon the selection of the third, then the third shall be appointed, upon request by either Party, by the then Presiding Judge of the St. Louis Court of Appeals.

Sec. 3.—After the matter has been referred to arbitration, and while it is pending arbitration, there shall be neither strike nor lockout; provided, however, that if neither party demands arbitration, or if, after arbitration is demanded, the other party fails or refuses to cooperate in prompt selection of, and submission of, the dispute to the Board of Arbitration, either party preserves the right to exercise its economic power in support of its demands, and any such action shall not be a violation of this contract, notwithstanding any other provisions of this contract.

Reducing this case to its bare essentials, we observe that labor and management agreed to grieve disputes and to submit disputes to the arbitral forum upon consent; that management never sought to force completion of the grievance procedure; that management did not communicate to the union before terminating the contract its consent to arbitrate; and that industrial strife ensued. The company could have compelled completion of the grievance procedure or communicated to the union its consent to arbitration, and thereby avoided these traumatic ruptures. We therefore hold that, in evaluating the company's post-strike actions, the Board should have considered as a factor the company's failure to seek peaceful resolution through the grievance procedure and in the arbitral forum.

*United Steelworkers of Am., AFL–CIO–CLC v. N. L. R. B., supra* at 278.

That Court further stated:

To summarize, the polestars of the national labor policy today are that industrial strife is to be avoided and that arbitration or alternative peaceful conflict resolutions are to be favored. The contract between the union and the company prohibited strikes unless and until a grievance and arbitration procedure had been exhausted. The union struck prematurely. The company then joined the union in resort to the tooth and claw of industrial warfare when it might as easily have turned the other cheek and taken affirmative steps to get the dispute back in the available arbitral forum. The Board reasoned that the strike was an unprotected, material breach of the contract because the company's initial unfair labor practice was "non-serious"; it overlooked the company's failure to resort to available, peaceful alternatives. In light of recent trends in labor policy, we find error in this oversight.

*Id.* at 281.

■ We have no quarrel with the Third Circuit's decision. It may encourage arbitration and avoid industrial strife. The decision should not, however, be viewed as a precedent for permitting a union, that is a party to a contract with a broad arbitration clause, to ignore arbitration, to strike in order to secure a new contract and the continued employment of its members and then to recover lost wages for its striking members. Such a holding would discourage arbitration and encourage strikes. *Cf. Childrens Rehab. Ctr., Inc. v. Service Emp. Int. U. Loc. 227,* 503 F.2d 1077 (3d Cir.), *cert. denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974). We decline the opportunity to make the practice a permissible one.

The decision of the District Court is affirmed.