### UNITED STATES STEEL CORPORATION

v.

### UNITED MINE WORKERS OF AMERICA et al., Appellants.

#### No. 76–1060.

United States Court of Appeals, Third Circuit.

Argued Sept. 7, 1976.

Decided Dec. 20, 1976.

whether a union can be held liable to an employer in money damages for the refusal of union members to cross a stranger picket line [1] when the collective bargaining agreement between the union and the employer provides a detailed grievance-arbitration procedure but contains no express no-strike clause. A jury rendered a verdict in favor of the plaintiff employer, United States Steel Corporation ("U.S. Steel"), and against the defendant International Union, United Mine Workers of America ("UMW"), its District 4, and its Local Union 6321. The district judge, relying on this court's decision in *Island Creek Coal Co. v. UMW*, 507 F.2d 650 (3d Cir.), *cert. denied*, 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975), denied the defendants' motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial.[2] Because we believe that the Supreme Court's recent decision in *Buffalo Forge Co. v. United Steelworkers*, 397 U.S. 428, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), undercuts the vitality of *Island Creek*, we reverse.[2A]

Harrison Combs, United Mine Workers of America, Washington, D. C., Melvin P. Stein, Kuhn, Engle, Blair & Stein, Pittsburgh, Pa., for appellants.

James H. McConomy, Harley N. Trice II, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee.

Before ADAMS, ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case presents a question of increasing importance in industrial relations:

### I.

In August 1969, U.S. Steel's Robena Mine Complex in Greene County, Pennsylvania, was closed down for approximately one week because employee-members of UMW Local 6321 refused to cross picket lines established by certain West Virginia coal miners. The pickets, who were members of UMW Local 1058 and employees of the Christopher Coal Company, were protesting the discharge of five local union officers and committeemen from Christopher's Humphrey mine in northern West Virginia.[3]

At the time of this incident, the collective bargaining agreement in force between

1. A "stranger picket line" is a picket line established by a union other than the union which is a party to the employer's collective bargaining agreement.

2. *United States Steel Corp. v. UMW*, Civil No. 69–970 (W.D.Pa. Nov. 13, 1975).

2A. *See Latrobe Steel Co. v. United Steelworkers*, 545 F.2d 1336 (3d Cir. 1976).

3. The dispute at the Humphrey mine arose over a job-bidding grievance. After the five union officers and committeemen were discharged, Humphrey employees began picketing other mines in West Virginia and Pennsylvania.

UMW and U.S. Steel was the National Bituminous Coal Wage Agreement of 1968.[4] That contract did not expressly prohibit strikes or the honoring of picket lines. The agreement did, however, provide for detailed grievance-arbitration procedures covering "differences . . . as to the meaning and application of the provisions of this agreement, . . . differences . . . about matters not specifically mentioned in this agreement, or . . . any local trouble of any kind . . . ."[5] These arbitration provisions were given even greater effect by the parties' agreement that they would "maintain the integrity of [the] contract" and that all disputes which were not settled by agreement would be settled "by the machinery provided in the 'Settlement of Local and District Disputes' section of [the] agreement unless national in character . . . ."[6]

U.S. Steel brought an action for money damages founded on section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, against the International UMW, its District No. 4, and Local Union No. 6321.[7] The corporation claimed that the week-long work stoppage at the Robena complex was in fact a sympathy strike in support of the Humphrey miners, and that the failure of the defendants to invoke the grievance-arbitration procedures to resolve the problem breached the collective bargaining agreement.

At the trial in November 1973, the defendants denied that the Robena work stoppage was a sympathy strike. Rather, they asserted, the union members had refused to cross the stranger picket line because the Humphrey pickets had allegedly threatened violence should the Robena employees return to work. The defendants claimed that because the Robena work stoppage resulted from the employees' fear for their safety,

resort to the grievance-arbitration procedures was not obligatory. In making this claim, the defendants relied on *Gateway Coal Co. v. UMW,* 466 F.2d 1157 (3d Cir. 1973), which held that absent an express provision in the collective bargaining agreement, a union has no contractual duty to submit a safety dispute to arbitration. Subsequent to the trial in the instant case, the Supreme Court reversed this court's *Gateway* decision, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

The district judge charged the jury that the grievance-arbitration procedures provided in the collective bargaining agreement impliedly prohibited work stoppages by the defendants' members, and that a work stoppage in sympathy with the strike at the Humphrey mine would violate the contract. He further charged, however, in accordance with this court's *Gateway* decision, that if the defendants' members stopped work "because of good faith apprehension of physical danger due to abnormally dangerous conditions for work existing at their place of employment, such conduct . . . would not violate the contract." The district judge also instructed the jury that if the Robena work stoppage was "unauthorized," then all three defendants had an obligation to use every reasonable means under the circumstances to end that work stoppage.

The jury returned a verdict in favor of the plaintiff, U.S. Steel, and against all three defendants. The defendants then moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial, contending that an obligation not to strike could not be implied because the primary dispute that caused the work stoppage, not being between members of Local 6321 and U.S. Steel, was not arbitrable. When the district judge denied the motion

4. This is the same collective bargaining agreement that was construed by the Supreme Court in *Gateway Coal Co. v. UMW,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

5. National Bituminous Coal Wage Agreement of 1968, "Settlement of Local and District Disputes."

6. *Id.,* "Miscellaneous," ¶ 3.

7. U.S. Steel's complaint also sought a preliminary injunction ordering the defendants to cease the work stoppage. After the Robena employees returned to work, U.S. Steel did not proceed with the request for an injunction.

in 1975, he acknowledged the existence of authority to support the defendants' contention but followed this court's decision in *Island Creek Coal Co. v. UMW,* 507 F.2d 650 (3d Cir.), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975).[8] *Island Creek* held that a dispute over whether a union had contracted away its members' right to honor a stranger picket line was arbitrable under the grievance-arbitration provisions of the National Bituminous Coal Wage Agreement of 1971, provisions which, for practical purposes, were identical to the grievance-arbitration provisions of the 1968 Agreement.

While this appeal was pending, the Supreme Court decided *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). At our request, the parties submitted supplemental briefs considering the applicability of *Buffalo Forge* to this case.

## II.

In *Buffalo Forge,* production and maintenance employees honored picket lines established at their employer's plants by "office clerical-technical" ("O&T") employees during an economic strike. The production and maintenance employees were parties to a collective bargaining agreement which contained an express no-strike clause and which provided a grievance-arbitration procedure covering "differences . . . as to the meaning and application of the provisions of [the] Agreement" and "any trouble of any kind" arising at the plant. 428 U.S. at 400, 96 S.Ct. at 3143.

The employer brought suit under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1970), claiming that the strike by production and maintenance employees was a violation of the express no-strike clause and contending, in the alternative, that the question whether the work stoppage violated the no-strike clause was itself arbitrable. The employer requested both injunctive relief and damages. The union asserted that the work stoppage did not violate the no-strike clause.

The district court in *Buffalo Forge* found that the production and maintenance employees were engaged in a sympathy action in support of the striking O&T employees. The district court then held that section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104 (1970), forbade the issuance of an injunction because the production and maintenance employees' strike was not over an arbitrable grievance and thus was not within the narrow exception to the Norris-LaGuardia Act established in *Boys Markets, Inc. v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The Court of Appeals for the Second Circuit affirmed the denial of a preliminary injunction.

The Supreme Court of the United States affirmed the decision of the Second Circuit. *Boys Markets* injunctions, the Court held, are limited to situations in which a strike has been "precipitated by" or is "over" an arbitrable dispute between the employer and the striking union. Although finding that the question whether the strike by production and maintenance employees violated their express no-strike undertaking was arguably arbitrable, even though the strike was not enjoinable, the Supreme Court recognized that this was a secondary dispute which was a result and not a cause of the strike:

> *Boys Markets* plainly does not control this case. The District Court found, and it is not now disputed, that the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither its causes nor the issue underlying it were subject to the settlement procedures provided by the contract between the employer and respondents. The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of his bargain. Thus had the contract not con-

---

**8.** *United States Steel Corp. v. UMW,* Civil No. 69–970 (W.D.Pa., Nov. 13, 1975), typed op. at 4.

tained a no-strike clause or had the clause expressly excluded sympathy strikes, there would have been no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike in this case.

428 U.S. at 407, 96 S.Ct. at 3147 (emphasis in original).

 *Buffalo Forge's* specific holding that a district court is without power to enjoin a sympathy strike pending an arbitrator's decision as to whether the strike is forbidden by a no-strike· clause of a collective bargaining agreement rests ultimately on the terms of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–15 (1970). Because the instant case, unlike *Buffalo Forge,* was tried on the issue of liability for money damages resulting from a breach of contract rather than on the issue of entitlement to injunctive relief, the Norris-La-Guardia Act has no application to this case. That does not mean, however, that *Buffalo Forge* is not dispositive of the present appeal. The Supreme Court's decision indicates that in order for a work stoppage to be enjoinable pending arbitration, the collective bargaining agreement must provide arbitration procedures and the dispute that precipitates the stoppage must be subject to binding arbitration under the terms of the contract. The propriety of an award of monetary damages resulting from a work stoppage, on the other hand, depends on the determination whether the union is under a contractual duty not to strike. Because the collective bargaining agreement in the instant case did not contain an express no-strike clause, that determination in turn depends on whether the dispute underlying the work stoppage was arbitrable. *Gateway Coal Co. v. UMW,* 414 U.S. 368, 94

S.Ct. 629, 38 L.Ed.2d 583 (1974). In both cases, therefore, arbitrability is a key issue. What *Buffalo Forge* establishes regarding the arbitrability of sympathy strikes is as applicable to this particular suit for monetary damages as it is to a request for injunctive relief.

### III.

We reject U.S. Steel's contention in this court that the work stoppage at the Robena mine was not a sympathy strike in support of the Humphrey employees, but rather was a dispute between the parties as to the safety of conditions for work. *Buffalo Forge* has enabled U.S. Steel to find grist in the union's argument in the district court: what the employer characterized in the heat of trial as a sympathy strike[9] it urges in this more temperate appellate climate to have been a safety dispute.[10] U.S. Steel's candor in acknowledging its earlier misconception of· the essence of the controversy is admirable but unavailing. We must scrutinize the factual issues as they were submitted to the jury, not as they are portrayed in the light of recent legal developments. The district judge charged the jury that if the defendants' members stopped work in sympathy with the strike at the Humphrey mine, such conduct would violate the contract, but that if the defendants' members stopped work because of "good faith apprehension of physical danger due to abnormally dangerous conditions for work existing at their place of employment," such conduct would not violate the contract. Implicit in the jury's verdict for the plaintiff was the factual finding that the Robena work stoppage was a sympathy strike in support of the Humphrey employees and a rejection of the "safety" theory advanced by the union.

9. *See, e. g.,* Transcript at 239–40:
 Mr. McConomy [counsel for plaintiff]: . . There is no question it was a sympathy strike.

10. Appellee's Brief in Response to the Court's Request of July 30, 1976, Concerning the Implications of *Buffalo Forge* at 5:
 [T]he work stoppage arose over a dispute between the parties as to the safety of condi-

tions for work, thereby establishing a clear breach of the implied no-strike obligation of the labor agreement under the Supreme Court's decision in *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

On appeal from the granting or denial of a motion for judgment notwithstanding the verdict, we are bound to view the evidence in the light most favorable to the verdict winner and to give the party the benefit of all inferences that the evidence fairly supports. *See, e. g., Fireman's Fund Insurance Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1177 (3d Cir. 1976); *O'Neill v. Kiledjian,* 511 F.2d 511, 513 (6th Cir. 1975); *Cockrum v. Whitney,* 479 F.2d 84, 85–86 (9th Cir. 1973); 5A J. Moore, Federal Practice ¶ 50.-07, at 2356–57 (1975). The record adequately supports the jury's implied factual finding that the work stoppage at the Robena mine was a sympathy strike. We must therefore treat the Robena work stoppage as a sympathy strike, and determine whether that strike was arbitrable under the National Bituminous Coal Wage Agreement of 1968 and the principles established by *Buffalo Forge.*[11]

In this case, as in *Buffalo Forge,* the strike was not "*over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract." 428 U.S. at 407, 96 S.Ct. at 3147. (emphasis in original). The Robena strike, like the strike in *Buffalo Forge,* "was a sympathy strike . . . ; neither its causes nor the issue underlying it were subject to the settlement procedures provided by the contract between the employer" and the union. *Id.* The job-bidding dispute at the Humphrey mine [12] which precipitated the Robena work stoppage was a dispute between the Christopher Coal Company and members of UMW Local 1058; that dispute could not possibly have been arbitrated by the United States Steel Corporation and UMW Local 6321. Had the contract in the instant case contained a no-strike clause, the issue whether the sympathy strike violated the union's no-strike undertaking might have been arbitrable. In the absence of a no-strike clause, however, *Buffalo Forge* establishes that there is "no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike" in this case. 428 U.S. at 408, 96 S.Ct. at 3147. To the extent that *Island Creek Coal Co. v. UMW,* 507 F.2d 650 (3d Cir.), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975), suggests otherwise, it seems clear that that decision cannot survive *Buffalo Forge.* The Supreme Court observed in the latter case that

> [t]o the extent that the Court of Appeals . . . and other courts, *Island Creek Coal Co. v. United Mine Workers,* 507 F.2d 650, 653–54 (CA 3), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975) . . ., have assumed that a mandatory arbitration clause implies a commitment not to engage in sympathy strikes, they are wrong.

428 U.S. at 408, 96 S.Ct. at 3147 n.10. Quite simply, the work stoppage at the Robena mine presented no arbitrable issue.[13] We conclude, therefore, that the Robena sympathy strike was not a breach of the National Bituminous Coal Wage Agreement of 1968.

U.S. Steel contends that the Robena work stoppage was in fact "over" an arbitrable dispute. The controversy between Local 1058 and the Christopher Coal Company which precipitated the Robena strike was

11. Consequently, we have no occasion to consider the applicability of *Gateway Coal* to a refusal by union members to cross a stranger picket line because the pickets have allegedly threatened violence. *See* note 10 *supra.*

12. *See* note 3 *supra.*

13. U.S. Steel attempts to circumvent *Buffalo Forge* by arguing that the defendants are liable for breach of their duty to arbitrate. The union had a contractual obligation, the employer asserts, to arbitrate the dispute over whether union members had the right to honor the stranger picket line. Had the contract contained an express no-strike clause, this contention might have merit. Where an obligation not to honor a stranger picket line could arise only from the duty to arbitrate, however, it is unnecessary to arbitrate the issue that *Buffalo Forge* settles in the union's favor: whether a mandatory arbitration clause implies a commitment not to engage in sympathy strikes.

over job bidding and employee discharges. These types of disputes, the employer argues, "are typically and traditionally subject to resolution under the arbitration provisions of the 1968 labor agreement" to which Local 1058 and Christopher were parties. U.S. Steel thus attempts to distinguish this case from *Buffalo Forge* on the ground that the Humphrey strike, which triggered the Robena work stoppage, was an illegal work stoppage over a dispute subject to arbitration, whereas the primary dispute in *Buffalo Forge* was concededly legal.

The record contains little evidence regarding the dispute at the Humphrey mine, and we are unwilling to assume, without more, that that dispute was arbitrable and the Humphrey strike illegal. We think it sufficient to dispose of U.S. Steel's contention by observing that the Robena strike was not over any dispute "between the Union and the employer"—between UMW and U.S. Steel—that was subject to arbitration. *Buffalo Forge, supra,* 428 U.S. at 405, 96 S.Ct. at 3146.

### IV.

U.S. Steel contends that even if the Robena strike did not violate the Local Union's implied no-strike obligation, we must nevertheless affirm the district court's judgment as to the International and the District Union. Under the National Bituminous Coal Wage Agreement of 1968, the employer asserts, the International and the District were obliged to take all reasonable steps to terminate the allegedly illegal Humphrey strike and to prevent its spread. The jury, the argument concludes, found the International and the District vicariously liable for the conduct of the members of Local 6321 and primarily liable for their own failure to take all reasonable steps to prevent the spread of the Humphrey strike to the Robena mine. U.S. Steel relies on *Eazor Express, Inc. v. International Brotherhood of Teamsters,* 520 F.2d 951, 959 (3d Cir. 1975), *cert. denied,* 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), which held that an express no-strike undertaking

pending arbitration implies an obligation on the part of the union parties to use every reasonable means to bring an end to a strike begun by their members without their authorization, and on *United States Steel Corp. v. UMW,* 534 F.2d 1063, 1072–73 (3d Cir. 1976), which extended *Eazor Express* to no-strike obligations implied by binding arbitration provisions.

We decline to consider whether the rationale of *Eazor Express* would permit an employer to recover damages for the failure of a union to take all reasonable steps to prevent the spread of an unauthorized and allegedly illegal strike against another employer. This case was not tried on that theory. As we have previously pointed out, the record presents little evidence regarding the dispute at the Humphrey mine. U.S. Steel argued in the district court not that the International and the District Union were liable for failing to take reasonable action to prevent the spread of the Humphrey dispute, but rather that the International and the District Union were liable for inaction in terminating the Robena strike. Because we have concluded that the Robena work stoppage did not breach the collective bargaining agreement, and because the issue of the union's liability for the spread of the Humphrey strike was not tried in the district court, the judgment as to the International and the District cannot stand.

### V.

Accordingly, the judgment of the district court will be reversed and the cause remanded with directions to enter judgment in favor of all defendants notwithstanding the verdict.

GARTH, Circuit Judge, concurring:

Based on my understanding of the teaching of *Buffalo Forge Co. v. United Steelworkers,* 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), I concur in the result reached by the majority. I believe that *Buffalo Forge* can best be understood by examining its implication with respect to three categories of labor contracts.

The first category consists of contracts which expressly forbid sympathy strikes, as well as all other strikes, and which provide for mandatory arbitration of all grievances. When a contract in this category is in force, the reasoning of *Buffalo Forge* clearly suggests that the legality of a sympathy strike would be immediately arbitrable and that such a strike could be enjoined pending the outcome of the arbitration. Damages for such an illegal strike would undoubtedly be recoverable.

The second category consists of contracts—like the one involved in *Buffalo Forge*—which contain general "no strike" clauses and provisions for mandatory arbitration of grievances. Contracts in this category differ from those in the first category in one important respect: whereas the contracts in the first category expressly forbid sympathy strikes, those in the second simply forbid all strikes generally. *Buffalo Forge* holds that when contracts in this category are involved, the legality of a sympathy strike is clearly subject to arbitration but that the sympathy strike cannot be enjoined pending the arbitrator's decision. *Buffalo Forge* also indicates that should the arbitrator eventually determine that the strike was illegal, it could be enjoined at that time. 428 U.S. at 405, 96 S.Ct. at 3146. Although *Buffalo Forge* did not discuss whether an employer could recover damages for a sympathy strike under a contract of this sort it would appear that damages could be recovered in those cases in which it was ultimately determined that the strike was illegal.

The third category consists of contracts—like the one involved in *Island Creek Coal Co. v. United Mine Workers,* 507 F.2d 650 (3d Cir. 1975), *cert. denied,* 423 U.S. 877, 96 S.Ct. 150, 46 L.Ed.2d 110 (1975)—which contain provisions for mandatory arbitration of grievances but which do not contain an express "no strike" clause of any sort. With respect to these contracts, *Buffalo Forge* stated flatly: "To the extent that the Court of Appeals . . . have assumed that a mandatory arbitration clause implies a commitment not to engage in sympathy strikes, they are wrong." 428 U.S. at 408, 96 S.Ct. at 3147 n.10. Justice White also stated that under such a contract there would be "no possible basis for implying from the existence of an arbitration clause a promise" not to engage in sympathy strikes. 428 U.S. at 408, 96 S.Ct. at 3147. In other words, *Buffalo Forge* established as a matter of law that a sympathy strike does not violate a labor contract which falls into this category. Of course, it goes without saying that a sympathy strike could not be enjoined under this type of contract. In addition, the legality of such a strike would not even be subject to arbitration, since *Buffalo Forge* established that such strikes are legal. Furthermore, since as a matter of law sympathy strikes cannot violate contracts in this category, damages could not be recovered.

The labor contract involved in the instant case quite clearly falls into the third category. Hence, there having been no contract violation by UMW Local 6321 and therefore no damages allowable to United States Steel Corporation, judgment should have been entered in favor of the Union.