**REPUBLIC STEEL CORPORATION, Appellant in No. 77–1350,**

v.

**UNITED MINE WORKERS OF AMERICA, United Mine Workers of America, District No. 5, United Mine Workers of America, Local No. 9873, United Mine Workers of America, Local No. 688, Gerald Abbott, Theodore Spazok, Peter Trbovich, Nick Paskovich, and Robert Famularo.**

**REPUBLIC STEEL CORPORATION, Appellant in No. 77–2037,**

v.

**UNITED MINE WORKERS OF AMERICA, United Mine Workers of America, District No. 5, United Mine Workers of America, Sub-District No. 3, United Mine Workers of America, Local No. 9873, United Mine Workers of America, Local No. 688, Gerald Abbott, Theodore Spazok, Peter Trbovich, Nick Paskovich, Robert Famularo, John Doe, and Richard Roe.**

**Appeal of INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA, in No. 77–2038.**

Nos. 77–1350, 77–2037, 77–2038.

United States Court of Appeals, Third Circuit.

Argued Dec. 9, 1977.

Decided Feb. 2, 1978.

---

468

Richard I. Thomas, John T. Ferguson, II, Thorp, Reed & Armstrong, Pittsburgh, Pa., for Republic Steel Corp.

Harrison Combs, Gen. Counsel, United Mine Workers of America, Washington, D. C., Melvin P. Stein, Lee A. Lazar, Kuhn, Engle & Stein, Pittsburgh, Pa., for International Union, United Mine Workers of America.

Before ALDISERT and WEIS, Circuit Judges, and CHRISTENSEN, District Judge.*

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

These consolidated appeals ask us to consider the liability of an international union, a district, sub-district, and two locals of that union, as well as individual union officers, for money damages sustained by an employer as the result of allegedly illegal work stoppages by union employees.

Republic Steel Corporation [Republic], which owns and operates coal mines in Washington County, Pennsylvania (the "Clyde Mine") and Westmoreland County, Pennsylvania (the "Banning Mine"), sought injunctive relief [1] and damages in two separate law suits before different district judges, pursuant to section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185. Republic based its claims for compensatory damages on the loss of business it sustained when local members of the United Mine Workers of America [UMWA] at the Clyde and Banning Mines refused to cross picket lines erected by stranger pickets in August 1975 and January 1976. By answer the unions contended that the work stoppages were caused by wildcat strikes, not called, authorized, or ratified by the unions. The stranger pickets in the January 1976 strike were identified in Republic's complaints as John Doe and Richard Roe, and were later conceded by the union to be members of UMWA Local 6290 who were engaged in a dispute with their employer at the Nemacolin Mine of the Buckeye Coal Company. Buckeye Coal employees, like Republic's production and maintenance employees at the Clyde and Banning Mines, are represented for collective bargaining purposes by the UMWA and its respective district, sub-district and local unions.

The record does not disclose the nature of the disputes the stranger pickets had with their employer. Thus, we do not know whether these disputes were subject to compulsory grievance-arbitration procedures under a collective bargaining agreement. Nor does the record disclose what, if any, action the unions took either to terminate the strikes engaged in by the stranger pickets or to prevent the spread of those strikes in the Clyde and Banning Mines.

In No. 77–1350, summary judgment was entered in favor of all defendants; this judgment is appealed by Republic. In Nos. 77–2037 and 77–2038, summary judgment was entered as to all defendants except the International Union; both Republic and the International Union appeal the judgment to the extent that it is adverse to their respective interests. The district court in the latter case made its order final under Rule 54(b), Fed.R.Civ.P., and certified the following as a controlling question of law under 28 U.S.C. § 1292(b):

> Whether the International Union, UMWA, is liable [2] in damages for failing to use every reasonable effort to stop the spread of illegal wildcat strikes waged by UMWA members against other employers, thereby inducing plaintiff's employees to engage in sympathy strikes.

This complex and important litigation thus requires us to consider and decide issues not reached in the recent sympathy strike decisions of this court and the Supreme Court. In *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), which was decided while the present actions were pending in the district courts, the Supreme Court determined that a federal court could not enjoin a sympathy strike pending an arbitrator's decision as to whether the strike was forbidden by an express no-

---

* Honorable A. Sherman Christensen, of the United States District Court for the District of Utah, sitting by designation.

1. Without determining the validity of Republic's claim for injunctive relief, we note that this aspect of the case is now moot.

2. In the posture in which we decide this case, the certified question must be treated as reading "can be liable" rather than "is liable".

strike provision in the collective bargaining contract to which the striking union was a party. Significantly, the parties in *Buffalo Forge* stipulated that the underlying strike[3] was "bona fide, primary and legal", *id.* at 403, 96 S.Ct. 3141, and did not contend that the issue underlying the sympathy strike was "subject to the settlement procedures provided by the contracts between the employer and respondents." *Id.* at 407–08, 96 S.Ct. at 3147. Subsequently, this court in *United States Steel Corp. v. United Mine Workers [U.S. Steel II]*, 548 F.2d 67 (3d Cir. 1976), determined that a union cannot be held liable to an employer for money damages in similar circumstances. Noting that it was presented with the same situation as the *Buffalo Forge* Court, where the strike was not "over any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract," 548 F.2d at 73, in *U.S. Steel II* we expressly declined to consider whether the rationale of our prior decision in *Eazor Express, Inc. v. International Brotherhood of Teamsters*, 520 F.2d 951 (3d Cir. 1975), *cert. denied*, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976), would permit an employer to recover damages for the failure of a union to take all reasonable steps to prevent the spread of an unauthorized and allegedly illegal strike against another employer. 548 F.2d at 74.

The question reserved in *U.S. Steel II* is squarely before us here. Because we determine that, in a sympathy strike context, an International union may be liable for damages if it did not exercise all reasonable efforts to halt conduct of its members which is proven to be unlawful, we reverse the summary judgment in favor of the International in No. 77–1350, while affirming the judgments of the district courts in all other respects.

*I.*

In considering the issues presented in this appeal, we are perforce aware of the broader context in which they arise. In *United Steelworkers of America v. NLRB*, 530 F.2d 266 (3d Cir.), *cert. denied sub nom. Dow Chemical Co. v. United Steelworkers of America*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976), we summarized the basic tenets of the contemporary national labor policy: an advanced economy which dictates that labor-management relations be as peaceful as possible; the consensual nature of labor-management agreements upon a forum for dispute resolution; the preference for arbitration as a forum for dispute resolution; and a shift in emphasis in labor legislation from the protection of a nascent labor movement to the encouragement of collective bargaining and the development of administrative techniques for the peaceful resolution of industrial disputes. *See id.* at 275.

These considerations evolved slowly, fueled primarily, if not exclusively, by the growth of America's labor unions. It is particularly appropriate that we consider their evolution in the context of America's coal miners, a group which worked toward these ends by investing tremendous amounts of their energy and resources, and sometimes their lives.

*A.*

Not until the middle third of this century were our nation's miners lifted from a semi-feudal existence into a position with even a semblance of bargaining power equal to that of the coal operators. Unlike other industries, mining provided a work situs far removed from urban centers. In the "company town", the miners were subjected to the economic, political, and social domination of "the company".[4] Their essentials

---

3. The operative vocabulary in sympathy strike cases is evolving as rapidly as the litigation in this area. The strike which precipitates the sympathy action is properly referred to as the "underlying strike". Although the terms "primary" and "secondary" strike have sometimes appeared in reference to the underlying and sympathy strikes, respectively, it is thought that the former terms are more properly used as terms of art in labor boycott situations.

4. Saul Alinsky has eloquently described life in a company town prior to the emergence of the UMWA as a powerful union force:

were obtainable only from the company, and their daily life was often subject to 24-hour supervision by para-military police employed by the company.[5]

Thus, although the call to unionize had been sounded to American miners as early as the mid-nineteenth century,[6] for many years management remained supremely endowed with innumerable rights while labor's right to organize (other than in craft unions) was virtually nonexistent. The situation is reflected in the law reports as well as the history books. In *Vegelahn v. Guntner*, 167 Mass. 92, 44 N.E. 1077 (1896), for example, despite a classic dissent by Justice Holmes, the Supreme Judicial Court of Massachusetts declared that placing two pickets at a plant entrance constituted "a private nuisance". And in 1917, in *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 250, 38 S.Ct. 65, 72, 62 L.Ed. 260 (1917), the Supreme Court afforded judicial sanction to the "yellow dog contract", determining "[t]hat the plaintiff [coal operator] was acting within its lawful rights in employing its men only upon terms of continuing non-membership in the United Mine Workers of America is not open to question." *See also International Organization v. Red Jacket Consol. Coal & Coke Co.*, 18 F.2d 839 (4th Cir.), *cert. denied*, 275 U.S. 536, 48 S.Ct. 31, 72 L.Ed. 413 (1927).[7]

> It is no exaggeration to describe the past life of the miners as one of serfdom. The shack a miner's family lived in, miserable as it was, did not belong to him—it was owned by the Company. The food he bought came from stores—owned by the Company. The clothes he bought came from a store—owned by the Company. When illness struck, his family called the doctor—owned by the Company. His shoes came from a store—owned by the Company; and the road they walked on was—owned by the Company. The stinking air of soot and coal dust was—owned by the Company. His children, condemned by family need of food, entered the mines, and they, too, were—owned by the Company. The miners buried their dead, and the companies buried their living in a present and future as black as the coal pits below. The Company owned everything, everything but the spirit of the miners—that they owned themselves.

S. Alinsky, John L. Lewis 8–9 (Putnam's 1949).

5. *See* H. B. Lee, Bloodletting in Appalachia (West Virginia University 1969); M. Musmanno, Black Fury (Fountainhead 1966). (Author Musmanno, later to become a justice of the Pennsylvania Supreme Court, introduced legislation which eventually abolished the infamous "Pennsylvania Coal and Iron Police" in 1935.)

6. In 1861, Daniel Weaver, whose efforts to organize miners planted the seed of the UMWA, delivered a speech to an ad hoc meeting of miners in Belleville, Illinois. It may be invoked as a valuable piece of social and political philosophy:

> Union is the great fundamental principle by which every object of importance is to be accomplished. Man is a social being and, if left to himself in an isolated condition, would be one of the weakest creatures; but, associated with his kind, he works wonders. Men can do jointly what they cannot do singly; and the union of minds and hands, the con-

> centration of their power, becomes almost omnipotent. Nor is this all; men not only accumulate power by union, but gain warmth and earnestness. There is an electric sympathy kindled, and the attractive forces inherent in human nature are called into action, and a stream of generous emotion, of friendly regard for each other, binds together and animates the whole.

> . . . . .

> In laying before you, therefore, the objects of this association, we desire it to be understood that our objects are not merely pecuniary, but to mutually instruct and improve each other in knowledge, which is power; to study the laws of life; the relation of Labor to Capital; politics, municipal affairs, literature, science, or any other subject relating to the general welfare of our class. Has not experience and observation taught us what one of the profoundest thinkers of the present day has said, that "all human interests, and combined human endeavors, and social growth in this world, have, at certain stages of their developments, required organizing; and Labor—the grandest of human interests—requires it now."

J. Finley, The Corrupt Kingdom 16–17 (Simon & Schuster 1972).

7. Utilized in the Red Jacket Case was the following contract of employment:

> I am employed by and work for the _____ Company, of _____, West Virginia, with the express understanding that I am not a member of the United Mine Workers of America, and will not become so while an employee of said _____ Company; that said Company agrees to run an "Open Shop" while I am employed by said _____ Company. If at any time I want to join or become connected with the United Mine Workers of America, or any affiliated organization, I agree to withdraw from the employment of

We note that a common thread running throughout the many years of labor's struggle to unionize was that of violence. For decades, the coal operators violently, and successfully, opposed UMWA organizational efforts from Pennsylvania to Colorado. Families of the miners did not escape "the company's" brutality. Upon the calling of a strike, for example, a favorite operator ploy was to evict all miners and their families from their company houses. Thus, in 1913 the Colorado Fuel and Iron Company evicted families into the freezing temperatures of a Colorado winter, forcing some 9,000 persons to settle in tent colonies set up by the UMWA. The tent colonies were then subjected to machine gun attacks by company detectives in an armored car.[8] And the history of Mingo, McDowell, and Logan Counties in West Virginia in the 1920's is an account of virtual civil war.[9]

### B.

It took congressional enactments to lift our nation's coal miners from their marginal existence, to outlaw finally oppressive tactics such as the "yellow dog contract", and to stem the tide of violence between employer and employee. On June 16, 1933, President Roosevelt signed the National Industrial Recovery Act [NIRA], which contained the famous section 7(a), vesting in employees "the right to organize and bargain collectively through representatives of their own choosing, and [to] be free from the interference, restraint, or coercion of employers of labor . . . ." NIRA, ch. 90, § 7(a), 48 Stat. 195, 198 (1933). Section 7(a) was to become the keystone of our national labor policy in the original National Labor Relations Act of 1935 [NLRA].[10]

said Company, and I further agree that while I am in the employ of said Company that I will not make any efforts amongst its employees to bring about the unionization of said employees against the Company's wishes. I have either read the above or it has been read to me.

Dated this the _____ day of _____, 19___.

(Signed)

Lee, *supra*, at 78.

**8.** P. Collier & D. Horowitz, The Rockefellers 108–09 (Signet 1977). *See also* J. Finley, *supra*, at 123–25.

**9.** A McDowell County experience is illustrative:

There were guerilla forays into Logan County, where Don Chafin, the most hated and cruel of all the sheriffs in the coal counties, maneuvered his deputies to smash the union. In 1921, even with United States Army troops in the area, the miners mobilized an army of six thousand men, gathered at a ball-park encampment in Madison, West Virginia. . . . As the miner army marched out, the 19th Infantry of the United States Army, with planes and heavy weapons of intimidation, moved between the combatants; federal authority was recognized; miners turned back to their tents.

Finley, *supra*, at 128–29. *See also* Lee, "The Armed March", in Bloodletting in Appalachia, *supra*, at 94–103.

**10.** Section 1. The denial by employers of the right to employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions, by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions,

The UMWA can be justifiably proud of its role in formulating the new legislation.[11] And its success as a strong national labor union is directly attributable to the national labor policy as expressed by the congressional mandates: instilled with national force and vigor, the union was enabled to engage in industry-wide collective bargaining.[12]

### C.

By the late 1960's, it appeared that our national labor policy had crystallized into an emphasis on the peaceful resolution of industrial disputes. *See Boys Market, Inc. v. Retail Clerks Union,* 398 U.S. 235, 251, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); *Gateway Coal Co. v. UMWA,* 414 U.S. 368, 381, 94 S.Ct. 629, 38 L.Ed.2d 583 (1973); Gould, *On Labor Injunctions, Unions and the Judges: The Boys Market Case,* 1970 Sup.Ct.Rev.

215, 236 (Kurland ed.); *The Supreme Court, 1969 Term,* 84 Harv.L.Rev. 30, 200–01 (1970). The emphasis on peaceful labor-management relations had special relevance to coal operator-miner relationships, for their experience had been far from peaceful at its inception.

Were we able to end here, the historical development would appear to be one of great maturity. But a new, if not yet entrenched, phase, evidenced in increasingly frequent occurrences in the 1970's, strongly suggests a troubling return to reliance on violence in the dispute-settling process. Those of us who live in the coal regions bear witness to constant accounts of new and recurring violence in the coal fields. Many accounts involve members of the UMWA, the very union which has already suffered so much. The appearance of stranger or roving wildcat pickets, more-

and by restoring equality of bargaining power between employers and employees.

It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions in the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

National Labor Relations Act, ch. 372, § 1, 49 Stat. 449 (1935).

The last paragraph remains precisely the same in the current policy statement. *See* National Labor Relations Act, § 101, 29 U.S.C. § 151.

11. In its official history, the union has characterized section 7(a) as

the child of the UMWA. It was devised by Mr. [John L.] Lewis, Henry Warrum, UMWA legal adviser, and W. Jett Lauck, UMWA economist. After what Mr. Lewis has described as "forty revisions or emasculations", labor's Magna Charta was written into the NIRA. It had been lifted from coal industry stabilization bills which the UMWA had unsuccessfully tried to push through the 1928 and 1930 sessions of Congress.

John L. Lewis and the International Union Mine Workers of America (1952).

12. By 1946, the UMWA could be described as "the biggest, richest and most powerful labor

union in the land." B. Hume, Death and the Mines 20 (Grossman 1971).

The UMWA's official history recognizes the symbiotic relationship between the union's growth and the new legislation:

The National Industrial Recovery Act was signed by President Roosevelt on June 16, 1933. The law gave two important psychological openings to the UMWA and Mr. Lewis moved immediately to take advantage of them. The officers' report to the 1934 UMWA convention said:

"Coincident with the signing of the act by the President, the United Mine Workers of America conducted a vigorous organizing campaign in all the mining districts of the United States. Systematic plans were laid out, meetings were addressed by able field representatives and the enrollment of new members took place upon an unprecedented scale. It was easily demonstrated that the mine workers employed in the non-union areas of the mining industry would enthusiastically join the UMWA if they were privileged to do so. Local unions were established, local officers selected and installed, supplies furnished the local unions, and in less than thirty days from the signing of the act by the President the complete organization of the bituminous industry was effectuated. The accomplishment was so rapid and so spectacular that many people, including some officials of the government, refused to concede it as an actuality."

John L. Lewis and the International Union United Mine Workers, *supra,* at 46–47.

over, is said to be a significant factor triggering damage to life and property.[13]

Thus, while we are quick to note that the record in the present appeal does not disclose that violence was forthcoming from stranger pickets, we just as quickly appreciate the deadly potential for violence that currently exists in remote rural and mountain coal fields. This realization makes all the more serious our consideration of a union's responsibility to ensure that its members respect the national labor policy of peaceful resolution of industrial disputes.

## II.

Our analysis of whether the unions breached a duty in the specific events leading to the present litigation has as a focal point the National Bituminous Coal Wage Agreement of 1974, to which both Republic and the International Union "on behalf of each member thereof" are parties. Noting that the grievance-arbitration machinery in the National Bituminous Coal Wage Agreement of 1968 is "the exclusive and compulsory means for finally resolving disputes" between the parties, the Supreme Court has interpreted the Settlement of Local Disputes section [14] of that Agreement as "an implied undertaking not to strike." *Gateway Coal Co. v. UMWA*, 414 U.S. 368, 385 n. 15, 381, 94 S.Ct. 629, 640, 38 L.Ed.2d 583 (1974). This court has similarly interpreted the Settlement of Disputes provisions in the 1971 Agreement, *Island Creek Coal Co. v. UMWA*, 507 F.2d 650 (3d Cir. 1975), and has determined that the 1974 provisions are virtually identical to those of the 1971 Agreement. *United States Steel Corp. v. UMWA*, 534 F.2d 1063 (3d Cir. 1976).

In *Gateway Coal*, as in the present appeal, the UMWA stressed that the Agree-

---

**13.** Thus the Cleveland (Ohio) Plain Dealer of August 26, 1977 reported:

(Washington Post Service)

Charleston, W. Va.—An effort to stage a dramatic end to the wildcat strikes that have plagued the Appalachian coalfields for two months collapsed as gunfire was traded Wednesday night in an isolated mountain hollow 30 miles from here. * * *

The wildcat strike, which has idled as many as 85,000 UMW miners, about half the union's membership, is now largely confined to the Charleston-based District 17 and Eastern Kentucky's District 30, where 25,000 miners were reported out yesterday. In all, nearly 35,000 miners are striking, some over new issues such as a grievance over holiday pay that idled 7,000 in Illinois.

And the Clarksburg (West Virginia) Exponent reported on August 19, 1977:

Pikeville, Ky. (AP)—Thousands of coal miners in eastern Kentucky are "afraid to go back to work" because they have been intimidated and harassed by roving pickets who have shut down union mines in several states, a United Mine Workers official said Thursday.

Robert Carter, president of UMW District 30 in eastern Kentucky, said about 10,000 miners in his area have been out of work for weeks—some for nearly two months—because of a wildcat strike that began in West Virginia over a cut in union health benefits.

The strike spread quickly from West Virginia into the neighboring coal producing states of Virginia, Ohio, Pennsylvania, Kentucky, and now, Tennessee.

"Between 90 and 95 per cent of our men would go back to work if it wasn't for the pickets," Carter said. "They are afraid to go back to work. A lot have been getting threatening phone calls.

"Some have had their cars demolished," Carter said. "We had about 17 cars demolished at one mine."

Carter said the miners won't cross picket lines set up by the "roving pickets" and that he sees no immediate end to the strike.

**14.** Article XXIII(c) of the 1974 Agreement, the Settlement of Disputes section, establishes specific grievance procedures and provides that

[s]hould differences arise between the Mine Workers and the Employer as to meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time.

Article XXVII, entitled "Maintain Integrity of Contract and Resort to Courts", provides that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the "Settlement of Disputes" Article of this Agreement unless national in character in which event the parties shall settle such disputes by free collective bargaining as heretofore practiced in the industry, it being the purpose of this provision to provide for the settlement of all such disputes and claims through the machinery in this contract and by collective bargaining without recourse to the courts.

ment contains no express no-strike clause. *Gateway Coal's* response, that the implied obligation arises from the contractual commitment to submit disputes to arbitration, is instructive: "[A] no-strike obligation, express or implied, is the *quid pro quo* for an undertaking by the employer to submit grievance disputes to the process of arbitration." 414 U.S. at 382, 94 S.Ct. at 639, *quoting Boys Market, Inc. v. Retail Clerks Union*, 398 U.S. 235, 248, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970).

### A.

This judicial recognition of, and involvement in, the *"quid pro quo"* nature of mutual labor agreements was presaged, of course, by enactment of section 301 of the Labor-Management Relations Act (Taft-Hartley Act), 29 U.S.C. § 185(a),[15] which put labor on notice that our national labor policy is predicated on mutual obligations as well as rights. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), in which the Court held that a union can obtain specific performance of an employer's promise to arbitrate grievances under section 301(a), examined the statute as follows:

> Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike. Viewed in this light, the legislation does more than confer jurisdiction in the federal courts over labor organizations. It expresses a federal policy that federal courts should enforce these agreements on behalf of or against labor organizations and that industrial peace can be best obtained only in that way.

> To be sure, there is a great medley of ideas reflected in the [congressional]

hearings, reports, and debates on this Act. Yet, to repeat, the entire tenor of the history indicates that the agreement to arbitrate grievance disputes was considered as a *quid pro quo* of a no-strike agreement. And when in the House the debate narrowed to the question whether § 301 was more than jurisdictional, it became abundantly clear that the purpose of the section was to provide the necessary legal remedies.

353 U.S. at 455, 77 S.Ct. at 917. And three years after *Lincoln Mills*, in the *Steelworkers Trilogy*,[16] the Court enunciated the now familiar presumption of arbitrability in labor disputes:

> An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).

One important step remained. Section 301 had to be squared with the Norris-LaGuardia Act's proscription against federal injunctions of labor disputes. The landmark decision in *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), was discussed by this court in *United Steelworkers v. NLRB*, 530 F.2d 266, 274 (3d Cir.), *cert. denied sub nom. Dow Chemical Co. v. United Steelworkers of America*, 429 U.S. 834, 97 S.Ct. 100, 50 L.Ed.2d 100 (1976):

> *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26

---

15. Section 301(a) provides:

 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

16. *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

L.Ed.2d 199 (1970), extended the theories of both *Lincoln Mills* and the *Steelworkers Trilogy.* See *ibid.* at 241–244, 248, 90 S.Ct. 1583. Reasoning that the literal, anti-injunction terms of the Norris-La-Guardia Act must be accommodated with the subsequently enacted Section 301 of the Labor Management Relations Act and the purposes of labor arbitration, the Court held that Section 301 authorized injunctions against strikes in violation of contracts that called for arbitration of the underlying grievances. In so ruling, the Court emphasized that "consideration must be given to the total corpus of pertinent law and the policies that inspired ostensibly inconsistent provisions." *Ibid.* at 250, 90 S.Ct. at 1592.

Several threads of rationale run through *Boys Markets.* First, the importance of arbitration "as an instrument of federal policy for resolving disputes between labor and management". *Ibid.,* 398 U.S. at 243, 90 S.Ct. at 1588. Second, the availability, at least theoretically, of disparate remedies in state as opposed to federal courts under then-existing law. *Ibid.,* 398 U.S. at 243–46, 90 S.Ct. 1583. Third, the reaffirmation that a no-strike clause is a *quid pro quo* for an employer's agreement to submit disputes to arbitration, coupled with the realization that if the no-strike clause were not enforceable, there would be little incentive for management to agree to arbitration. *Ibid.,* 398 U.S. at 247–48, 90 S.Ct. 1583. Fourth, the belief that an accommodation between the Norris-LaGuardia Act and Section 301 was appropriate because "[a]s labor organizations grew in strength and developed toward maturity, congressional emphasis shifted from protection of the nascent labor movement to the encouragement of collective bargaining and to administrative techniques for the peaceful resolution of industrial disputes." *Ibid.* at 251, 90 S.Ct. at 1593.

Thus, *Boys Markets* sanctioned judicial enforcement of a no-strike clause given as a *quid pro quo* for an arbitration clause that is specifically enforceable on the authority of *Lincoln Mills;* so viewed, it is the corollary of *Lincoln Mills.* At the same time, a *Boys Markets* injunction is predicated on submission of the underlying dispute to the arbitral forum; accordingly, *Boys Markets* advances the *Steelworkers* principles as well.

### B.

The union argues, as it must, that *Buffalo Forge, supra,* and *U.S. Steel II, supra,* operate to relieve a union of its obligations under the foregoing principles when they arise in a sympathy strike context. We cannot agree that these cases render an employer powerless to seek any relief whenever its employees are constrained to join in a sympathy action.

■ *Buffalo Forge* restricted the availability of injunctive relief pending an arbitrator's decision on the scope of a no-strike obligation. The policy considerations of *Boys Markets, supra,* were determined not to apply when the issues underlying a strike are not arbitrable. A corollary to this rule, too infrequently noted, is an implied concession that the federal courts *may* consider enjoining a sympathy strike if it be shown that the issues of the underlying strike were not only found to be arbitrable, but were found by an arbitrator to violate the union's no-strike obligation. The corollary belies the contention that *Buffalo Forge* precluded *any* relief in sympathy strike situations.

More important, nor did *Buffalo Forge* preclude relief in *all* sympathy strikes. The underlying cause of the strike in *Buffalo Forge* was a recognition strike emanating from an employer's failure to recognize the union as a bargaining unit for certain of its employees. Clearly, the underlying dispute was not subject to grievance-arbitration procedures of a collective bargaining agreement, for there was simply no contract over which an arbitrable dispute could occur. Thus the parties had stipulated that the underlying strike was "bona fide, primary and legal", 428 U.S. at 403, 96 S.Ct. 3141, and the Supreme Court could find that

[t]he strike at issue was a sympathy strike in support of sister unions negotiating with the employer; neither [the sympathy strike's] causes nor the issue underlying it [negotiations for a contract] was subject to the settlement procedures provided by the contracts between the employer and the respondents. The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of his bargain.

428 U.S. at 407–08, 96 S.Ct. at 3147. In so finding, what the *Buffalo Forge* Court did not decide became as important as what it did: it *did* instruct that a potentially lawful sympathy action is not of the quality to invoke *Boys Markets* prior to an arbitrator's determination, but it *did not* decide what remedies are available to an employer when the issues precipitating the underlying strike are subject to settlement procedures.

*U.S. Steel II* shares with *Buffalo Forge* the crucial factor of the nonarbitrability of issues which had precipitated the underlying strike. We found in *U.S. Steel II* that [i]n this case, as in *Buffalo Forge,* the strike was not "*over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract." 428 U.S. at 407, 96 S.Ct. at 3147. (emphasis in original). The Robena strike, like the strike in *Buffalo Forge,* "was a sympathy strike . . . .; neither its causes nor the issue underlying it were subject to the settlement procedures provided by the contract between the employer" and the union. *Id.*

548 F.2d at 73.

Thus, because our analysis indicates that neither *Buffalo Forge* nor *U.S. Steel II* was tried on the theory Republic advances here—that the sympathy action resulted from an illegal underlying strike whose issues were subject to the compulsory settlement procedures of a collective bargaining agreement—we cannot ignore the potential presence of a no-strike obligation in the present appeals. In this respect, we must conclude that *Buffalo Forge* and *U.S. Steel II* do not compel rejection of Republic's claim for damages.

### C.

In order to prevent an adverse judgment on remand, however, Republic must prove more than the proposition that *Buffalo Forge* and *U.S. Steel II* do not bar all possible relief. Having cleared this hurdle, it is faced with the task of advancing affirmative support for its theory of recovery. Republic may find general support in this court's decision in *Eazor Express, Inc., supra,*[17] but the absence at this point of record support for the allegation that the issues

---

17. In *Eazor Express,* this court stated:

The district court held that necessarily implied in the unions' agreement that there should be no strike was an obligation on their part to use every reasonable means to bring to an end a strike begun by their members without their authorization. With this conclusion we agree. As the district court pointed out, collective bargaining agreements such as these impose a continuing day-to-day obligation on the parties to fulfill their terms in good faith. *Curtiss-Wright Corp., Wright Aero. Div. v. NLRB,* 3d Cir. 1965, 347 F.2d 61, 68; *see Conley v. Gibson,* 1957, 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80. This is certainly true with respect to the obligation that there should be no strike pending the use of grievance procedure. Accordingly, in the case of an unauthorized strike against their employer by all the members of a union who are employed by that employer, their union may not disclaim responsibility for the losses suffered by the employer as the result of the strike unless and until it has exhausted all reasonable means within its power to bring that unlawful action to an end. A no-strike agreement would be illusory indeed were a union to be permitted to avoid all responsibility under it for the duration of a prolonged strike which was being carried on by the concerted action of all its members employed in the struck operation, merely because the strike was not initially authorized or called by the union as an organization or by those of its officers who were specially empowered to do so. Rather than to construe a contract as producing such a result, the courts will favor a construction making the mutual promises binding and giving the contract legal effect. 1A *Corbin on Contracts* 8–9; 3 *Corbin on Contracts* 168–171; 17 Am.Jur.2d 452.

520 F.2d at 959–60.

precipitating the underlying strike were subject to collective bargaining suggests the necessity for more testimony and evidence than that adduced in the summary judgment proceedings below.

■ Without attempting to plot the extreme boundaries of proof, we think that Republic should at least be required to prove that the stranger picketing was conduct that would be enjoinable under the *Boys Markets* rule. That is, Republic should be required to prove that the dispute stranger UMWA pickets had with *their* employer or employers was one that was subject to the grievance and arbitration clause contained in the Agreement. And, of course, Republic must prove that the UMWA knew or should have known of the action of the stranger pickets, and nevertheless failed to exhaust all reasonable means to bring that unlawful action to an end.

### III.

■ Having determined that liability may exist, we are left with the thorny question of who may be held liable. We note initially that the individual officers and members of local unions cannot be held liable, for in *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962), the Supreme Court declared that an injured employer could not properly look to union officers and members in their individual capacities for damages suffered as a consequence of allegedly unlawful concerted activity: "When Congress passed § 301, it declared its view that only the union was to be made to respond for union wrongs, and that the union members were not to be subject to levy." *Id.* at 247–48, 82 S.Ct. at 1324. *See also Sinclair Oil Corp. v. Oil, Chemical & Atomic Workers International Union*, 452 F.2d 49, 52–54 (7th Cir. 1971).

We are not provided with similarly clear guidance in delineating international, district, sub-district and local liability. However, in the sympathy strike context there is an important factual distinction between the international on the one hand, and the district, sub-district, and local unions on the other. This is their ability to communicate with, and to the greatest lawful extent control, the concerted activities of their members in *both* the underlying and the resulting strikes. An implied obligation to take reasonable steps to prevent the spread of unlawful strikes can be imposed only to the extent that it can be exercised, and in the sympathy strike context, the crucial communication link which exists between the international union and *both* sets of strikers may well be nonexistent between the geographically limited branches of that union and the roving pickets.

■ There is admittedly a temptation to remand as to all union parties for a determination of the extent to which each exercised *some control* over both sets of strikers, for it is at least theoretically possible that the district, sub-district and local unions retained control either through specific membership ties or through the nature of their individual identification with the International. But in the absence of sufficient allegations to this effect, and especially in the absence of sufficient factual data presented by Republic in opposition to the defendants' motions for summary judgment, we are not constrained to disturb summary judgments in favor of the district, sub-district, and the locals. This is not to suggest, however, that a different result might not be forthcoming upon proper allegations and proof that the districts, sub-districts, and locals had discrete obligations under the collective bargaining agreement, custom, and/or the provisions of the constitutions and by-laws of the several unions. In the absence of sufficient allegations and proof to this effect, we are more properly influenced by *Buffalo Forge's* pointed reminder that a mandatory arbitration clause does not imply a duty not to engage in *sympathy* strikes. 428 U.S. at 408 n. 10, 96 S.Ct. 3141. This, in the end, is all the district, sub-district and locals are alleged to have done.

Accordingly, we reject Republic's effort to impose liability on the district, sub-district and local unions. We do this with an express reservation: recognizing that these

entities are often as much the victims of unlawful conduct as are the coal operators, we urge them to use all available powers and authority to discipline members who may be at the root of unlawful concerted activities. "Provisions in union constitutions and bylaws for fines and expulsion of recalcitrants . . . are . . . commonplace and were commonplace at the time of the Taft-Hartley Amendments." *NLRB v. Allis Chalmers Mfg. Co.,* 388 U.S. 175, 181–82, 87 S.Ct. 2001, 2007, 18 L.Ed.2d 1123 (1967). Although these amendments safeguard the right of a member "to express any views, arguments, or opinions", the statute contains an extremely important exception: "*Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." 29 U.S.C. § 411(a)(2). Indeed, this court has upheld the ultimate sanction—expulsion from the union—in response to a union member's persistence in organizing work stoppages in violation of the collective bargaining agreement in force. *Lewis v. American Fed'n of State, County and Municipal Employees,* 407 F.2d 1185 (3d Cir. 1969).

As we have indicated, on this record the International stands in a decidedly different posture from that of the districts, subdistricts and locals. When stranger pickets appear and interfere with the work of local members, it is not merely the brute force of these strangers that causes the local work stoppage. Rather, the interaction of the local miners and the stranger pickets comes from their common bond of membership in the same International union. Because membership in the International is the driving force, the International has a particularly grave responsibility to employ all reasonable means to ensure that unlawful actions be halted.

This responsibility is heightened by the industry-wide nature of the contract between the International and Republic.

Having signed on behalf of all of its members, the International was perforce acutely aware of the effects of the challenged sympathy strike on its various local and district memberships. There was a concommitant awareness by Republic that it shared with Buckeye the same agreement with the International. Under these circumstances, it is not unreasonable for a company in Republic's position to expect that the International would enforce its agreement with Buckeye just as it would with Republic. Indeed, the essence of our analysis of the *quid pro quo* nature of the labor contract would indicate that where there is an industry-wide contract, there is an *industry-wide commitment* to the peaceful settlement of grievances.

Thus, after thoroughly considering the foregoing principles of labor-management relations, and in light of the fact that both the stranger pickets and the striking Republic employees were members of the International and thereby subject to its guidance and control, we conclude that the International may be liable in damages if it is determined not to have exercised reasonable effort to halt unlawful conduct on the part of its members.

### IV.

Our holding that the International may be liable is mandated by the public interest. The International union simply must bear certain obligations if it is to continue to be entitled to the rights and benefits accorded by our national labor policy. To the extent that any union—local, district, or international; craft, industrial, or independent—refuses to enforce appropriately authorized union discipline upon recalcitrant members who violate either collective bargaining agreements or internal by-laws of the union, that union can be said to have abrogated a proportion of valued rights granted to the union under our national labor policy.

We note that through the instrumentality of the federal court system, the American public has intervened in recent years on literally thousands of occasions to umpire,

adjust, adjudicate, settle, or impose sanctions in disputes between the local, district, and international units of the UMWA and the coal operators.[18] We do not believe it is asking too much that the International fulfill some of its own responsibility to umpire, adjust, adjudicate, and settle, and where necessary, to impose sanctions upon those members who wilfully repudiate the obligations under the contract, defy the internal laws of the union, and disregard the federal statutes that constitute our national labor policy.

We will reverse that portion of the order filed January 5, 1977 in District Court case No. 75–1083, appealed at our case No. 77–1350, which granted summary judgment in favor of the International, insofar as monetary damages are concerned, and remand this cause to the District Court. In all other respects the order will be affirmed. We will affirm the District Court orders filed March 21, 1977 and June 27, 1977 in District Court case No. 76–92, appealed at our Nos. 77–2037 and 77–2038.

Each party to bear its own costs.

---

18. An example of the case load in one district court illustrates the high frequency of federal court interventions. A compilation furnished this court by the Clerk for the United States District Court for the Western District of Penn-

sylvania indicates that the UMWA, its districts, or locals, have been named defendants in over 300 cases from January 1, 1972 to December 21, 1977.